PEOPLE v HANA

PEOPLE v GALLINA

PEOPLE v RODE

Docket Nos. 94542, 94877, 94878. Argued March 8, 1994 (Calendar Nos. 3-4). Decided August 31, 1994. Rehearings denied *post*, 1203.

Durid B. Hana was convicted by a jury in a joint trial in the Macomb Circuit Court, Frederick D. Balkwill, J., of possession of over 650 grams of cocaine, and delivery of over 225, but less than 650, grams of cocaine. The Court of Appeals, HOOD, P.J., and SAWYER, J. (FITZGERALD, J., concurring in part and dissenting in part), affirmed the denial of the defendant's motion for a separate trial in an unpublished opinion per curiam (Docket No. 119380). The defendant appeals.

Eric Rode and Aldo Gallina were convicted in the Detroit Recorder's Court, Michael J. Talbot, J., of second-degree murder and possession of a firearm during the commission of a felony. The Court of Appeals, FITZGERALD, P.J., and HOOD and J. C. KINGSLEY, JJ., reversed in an opinion per curiam, finding that the trial court erred in trying the cases jointly before separate juries (Docket Nos. 125378, 125482). The people appeal.

In an opinion by Justice GRIFFIN, joined by Justices BRICKLEY, BOYLE, RILEY, and MALLETT, the Supreme Court *held:*

The decision to sever or join the trials of criminal defendants lies within the discretion of the trial court. Severance is mandated under MCR 6.121(C) only when a defendant demonstrates that substantial rights will be prejudiced and that severance is the necessary means of rectifying the potential prejudice.

1. MCL 768.5; MSA 28.1028 and MCR 6.121(D) provide that the decision to sever or join defendants in a criminal prosecution lies within the discretion of the trial court. Severance is mandated under MCR 6.121(C) only when a defendant provides the court with a supporting affidavit, or makes an offer of proof

REFERENCES

Am Jur 2d, Criminal Law §§ 649, 837, 848; Trial §§ 149, 157, 158, 161.

See ALR Index under Joint and Separate Trial.

that clearly, affirmatively, and fully demonstrates that substantial rights will be prejudiced and that severance is the necessary means of rectifying the potential prejudice. The failure to make this showing in the trial court, absent any significant indication on appeal that the requisite prejudice in fact occurred at trial, will preclude reversal of a joinder decision. While recognizing that a joint trial of codefendants presenting antagonistic defenses has serious negative implications for the accused, the standard for severance is not lessened. Inconsistency of defenses is insufficient to mandate severance; rather, the defenses must be mutually exclusive or irreconcilable. The risk of prejudice may be allayed by proper instructions and by the use of separate juries, itself a partial form of severance.

2. In *Hana,* the affidavit submitted in support of the motion for severance was conclusory in nature, lacking sufficient specificity to enable the trial court to accurately determine what the defenses would be, how they would affect each other, and whether the defendants' respective positions were mutually exclusive or merely inconsistent. Potentially prejudicial evidence, either physical or testimonial, was not substantiated by the affidavit or at the hearing. The defendant was not irretrievably prejudiced at trial. Virtually all the state's evidence was admissible against both defendants, and the attorneys' actions did not transform the proceedings into an unfair trial for the defendant. In light of the cautionary instructions by the trial court concerning reasonable doubt and the determination of guilt or innocence on an individual basis, the jury reasonably could be expected to compartmentalize the evidence pertaining to each defendant.

3. In *Rode* and *Gallina,* the defendants did not demonstrate prejudice to their substantial rights. The use of separate juries is a partial form of severance to be evaluated under the standard applicable to motions for separate trials. The issue is whether there was prejudice to substantial rights after the dual-jury procedure was employed. On the basis of a review of the record, no prejudice to either defendant was demonstrated under these circumstances.

*Hana,* affirmed.

*Gallina,* reversed.

*Rode,* reversed.

Justice LEVIN, joined by Chief Justice CAVANAGH, dissenting, stated that, on the facts of these cases, Durid Hana was prejudiced by the denial of his motion for a separate trial, and the dual-jury procedure in *Gallina* and *Rode* did not afford the

defendants the same protection they would have enjoyed in separate trials.

A close examination of the rationales favoring joint trials indicates that they are not as sound as they may initially appear. It is far from clear that a strict rule against severance significantly conserves judicial resources more so than a rule favoring severance. This is not to suggest that the judicial system derives no benefit from joint trials and dual-jury trials. In some instances, joint trials undoubtedly save courts and witnesses both time and annoyance. However, the rationales in favor of joint and dual-jury trials are not without their weaknesses. When a court is faced with claimed prejudice from joint or dual-jury trials, it should keep in mind that the case in favor of joint and dual-jury trials is not as strong as is commonly assumed and that even if joint and dual-jury trials are somewhat efficient, the first order of business of the criminal courts is justice, not economy or convenience.

While MCR 6.121(C) establishes the standard for determining when severance is required, it does not elaborate on what constitutes either prejudice or substantial rights. Thus it is the task of the Supreme Court to determine how the substantial rights of a defendant might be prejudiced in a joint trial in which the defendant and a codefendant present antagonistic or mutually exclusive defenses.

Defendants who accuse each other bring the effect of a second prosecutor into the case with respect to their codefendant. In order to zealously represent the client, each codefendant's counsel must do everything possible to convict the other defendant. Cross-examination of the government's witnesses becomes an opportunity to emphasize the exclusive guilt of the other defendant or to help rehabilitate a witness that has been impeached. The presentation of the codefendant's case becomes a separate forum in which the defendant is accused and tried. Closing arguments allow a final opening for codefendant's counsel to portray the other defendant as the sole perpetrator of the crime. The government's case becomes the only unified and consistent presentation, and the government is further benefited by the additive and profound effects of repetition. Joinder of defendants who assert mutually exclusive defenses has a final subtle effect: all evidence having the effect of exonerating one defendant implicitly indicts the other.

Mutually exclusive defenses in a joint trial may also prejudice a defendant's substantial rights when the acceptance of one defendant's defense would necessarily require the conviction of a codefendant. A defendant is prejudiced in this situa-

tion because the prosecution may be relieved of proving its case against that particular defendant beyond a reasonable doubt, and can simply rely on the process of elimination to secure at least one conviction.

In sum, when confronted with defendants seeking severance on the ground of antagonistic defenses, the task of the Supreme Court and that of trial courts considering motions for severance is to determine whether the defendant will be so prejudiced. If a defendant demonstrates that such prejudice will result from a joint trial, the trial should be severed from that of a codefendant. Even when a defendant is unable to meet the requirement for severance under MCR 6.121(C), a trial court has the discretion to order severance if it is appropriate to promote fairness to the parties and a fair determination of the guilt or innocence of one or more of the defendants.

The trial judge erred in refusing to sever Durid Hana's trial from that of his brother. Before trial it was evident that the jury surely would conclude that at least one of the brothers placed the cocaine in the safe in which it was found. During the trial, the prosecutor invited the jury to make just such a deduction, making clear that it had to convict at least one of the defendants. The prosecutor invited the jury to find the defendants guilty on the basis of the discrepancies between their stories, the clear implication being that neither of the defendants was presenting a truthful defense, thereby relieving herself of the burden of proving the defendants' individual guilt beyond a reasonable doubt.

Each defendant was further prejudiced by the actions of his codefendant's lawyer. Each suffered prejudice when his lawyer took on the role of the prosecuting attorney. Each had to defend against the prosecutor and the codefendant's lawyer. Thus, the judgment of the Court of Appeals affirming the trial court's denial of the severance motion should be reversed and the defendant granted a new trial.

In *Gallina* and *Rode,* the question presented is not whether the defendants should have had completely separate trials because that argument was waived by the prosecutor when he did not object to the defendants' motions for severance and when, in the Court of Appeals, he did not argue that severance was not required. The only question presented, assuming that the defendants were entitled to at least partial severance through the use of dual juries, is whether that solution provided the defendants the same protection as they would have enjoyed through separate trials.

The manner in which the trial court administered the dual-

jury procedure did not afford the defendants the same protection that they would have enjoyed through separate trials. The trial court failed to excuse Gallina's jury when Rode's counsel impeached a key prosecution witness with a prior statement that implicated Gallina. Had Gallina been tried separately, his jury would not have learned of the prior statement that implicated him. The prosecutor presumably would not have questioned the witness concerning his earlier statement in a separate trial because the inconsistency between the earlier statement and his testimony undermined his credibility. Gallina's lawyer, moreover, would never have questioned the witness concerning his earlier statement because to do so would have undermined his own client's position. Thus, because Gallina's jury learned of certain evidence that it would not have learned in a completely separate trial, the dual-jury procedure did not provide Gallina the same protection he would have had in a separate trial.

Rode was similarly denied the protection he would have enjoyed had he been tried in an entirely separate trial when Gallina's lawyer cross-examined another witness concerning his ability to see the shooting. Had Rode been tried separately, his jury would not have heard the damaging questioning. The prosecutor did not pursue this line of questioning at trial, and presumably would not have done so at an entirely separate trial, because it would not have been in the prosecutor's interest to establish that the witness did not have a clear view of Rode. And Rode's lawyer surely would not have asked questions that implied that his client leaned out the window and fired shots at the other automobile. Thus, the dual-jury procedure did not provide Rode with the same protection that he would have enjoyed in an entirely separate trial.

While the defendants correctly note that a trial court should pick the juries from separate venires in a dual-jury trial, the defendants did not suffer prejudice as a result of the trial court's failure to do so in this case. Juries in a dual-jury trial should be chosen from separate venires to prevent exposure of one defendant's jury to the antagonistic defense of a codefendant. If a jury learns of a codefendant's antagonistic defense, there is a danger that the jury will conclude that each defendant is lying and convict on the basis of the conflicting defenses alone. When separate juries in a dual-jury trial are chosen from a single venire, there is a substantial risk that the voir dire questions from defense lawyers and the court will apprise all the jurors of the conflicting defenses. In this case, however, the voir dire procedure did not substantially inform the pro-

spective jurors of the defendant's mutually antagonistic defenses. Both lawyers' questions focused primarily on the potential jurors' views of youthful offenders and on their ability to focus on the intent element of the charge. Neither lawyer mentioned the conflicting defenses.

196 Mich App 58; 492 NW2d 483 (1992) reversed.

CRIMINAL LAW — JOINT TRIALS — SEVERANCE.

The decision to sever or join the trials of criminal defendants lies within the discretion of the trial court; severance is mandated only when a defendant demonstrates that substantial rights will be prejudiced and that severance is the necessary means of rectifying the potential prejudice (MCL 768.5; MSA 28.1028; MCR 6.121[C], [D]).

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *Carl J. Marlinga,* Prosecuting Attorney, *Robert J. Berlin,* Chief Appellate Attorney, and *Linda Davis,* Assistant Prosecuting Attorney, for the people in *Hana.*

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *John D. O'Hair,* Prosecuting Attorney, *Timothy A. Baughman,* Chief, Research, Training and Appeals, and *Janice M. Joyce Bartee,* Assistant Prosecuting Attorney, for the people in *Gallina* and *Rode.*

*Stuart G. Friedman* for defendant Hana.

State Appellate Defender (by *Peter Jon Van Hoek*) for defendant Gallina.

*Edick & Esper, P.C.* (by *David J. Esper*), for defendant Rode.

Amicus Curiae:

*Chartrand & Badgley* (by *Robert L. Badgley*) for Metro Detroit Chapter-Parents of Murdered Children, Inc.

GRIFFIN, J. We have consolidated the appeals of these cases to consider related issues regarding the severance of trials of codefendants in criminal cases. In *People v Hana,* we address the question whether the trial court should have granted defendant's motion for severance in the context of the presentation of allegedly antagonistic defenses. In *People v Rode* and *People v Gallina,* the question presented is whether the dual-jury procedure utilized in these cases unduly prejudiced the defendants.

We hold, in line with MCL 768.5; MSA 28.1028 and MCR 6.121(D), that the decision to sever or join defendants lies within the discretion of the trial court. Severance is mandated under MCR 6.121(C) only when a defendant demonstrates that his substantial rights will be prejudiced and that severance is the necessary means of rectifying the potential prejudice.

Judged by this standard, we find in *People v Hana* that the trial court did not abuse its discretion in denying defendant's motion for severance. The decision of the Court of Appeals is therefore affirmed.

In *People v Rode* and *People v Gallina,* we conclude that the defendants have not demonstrated prejudice to their substantial rights. The use of separate juries is a partial form of severance to be evaluated under the standard, set forth above, applicable to motions for separate trials. The issue is whether there was prejudice to substantial rights after the dual-jury procedure was employed. On the basis of a review of the record, we find no demonstrated prejudice to either defendant under these circumstances. The Court of Appeals conclusion to the contrary is therefore reversed.

I

A. *PEOPLE v HANA*

Defendant Durid Hana was convicted of possession of over 650 grams of cocaine, MCL 333.7403(2)(a)(i); MSA 14.15(7403)(2)(a)(i), and delivery of over 225 but less than 650, grams of cocaine. MCL 333.7401(2)(a)(ii); MSA 14.15(7401)(2)(a)(ii).

Defendant and his brother, Kafan, were arrested following a controlled narcotics purchase in January, 1988, that took place at the Sterling Heights home in which the defendant and his brother lived with their parents and siblings.

At trial, it was established that the drug transaction arose out of a conversation between James Hornburger and Raed Alsarih at the Sterling Heights High School where they were students. Hornburger approached Alsarih about obtaining twelve ounces of cocaine for Stephen Putnam (an undercover narcotics police officer). Alsarih confirmed the transaction after contacting his "connection," Kafan. Hornburger, Putnam, and Alsarih drove to Kafan's home. Alsarih went to the door and spoke with defendant. Defendant contacted Kafan by beeper and reported that Kafan would be back in fifteen minutes. Putnam, Alsarih, and Hornburger drove to a parking lot, waited, and then returned to the Hana home. Defendant told Alsarih that Kafan had not yet returned. Putnam then dropped Alsarih and Hornburger off at Alsarih's home, with instructions to call him when Kafan arrived. Alsarih eventually called Putnam and reported that Kafan would have the twelve ounces of cocaine at 7:00 P.M.

Putnam picked up Alsarih and Hornburger and they again drove to the defendant's home. When they arrived, nobody answered the door. After

waiting a minute or two, they saw Kafan drive up
and Alsarih and Kafan went into the house to-
gether.

According to Alsarih, testifying pursuant to a
plea bargain, he went to a back bedroom with
Kafan where defendant was sleeping. Defendant
awoke when Kafan turned on the light. While
Kafan opened a safe, defendant asked Alsarih
whether the person outside was a police officer and
whether Alsarih had dealt with him before. Kafan
removed a plastic bag from the safe, mixed it with
the contents from some other bags and gave it to
Alsarih. Alsarih was given an "eight ball" (one-
eighth ounce of cocaine), which was to be given to
Hornburger for his part in the transaction. They
then proceeded to the door and Kafan watched
while Alsarih went out to Putnam's car. As Put-
nam opened the door, Alsarih explained that he
had been instructed not to get in. Putnam then
put his car keys on top of the car and refused to
leave. Defendant was watching from the living
room window. Alsarih then got in the back seat,
gave the bag of cocaine to Putnam, and Putnam
handed him $12,500 in marked money. Putnam
signaled to a surveillance team, which moved in
and arrested Hornburger, Alsarih, Kafan, and de-
fendant.

A subsequent search of the home, pursuant to a
search warrant, disclosed that the safe contained
three kilograms of cocaine, miscellaneous jewelry
and papers, a telephone recorder, and a telephone
beeper. Both Kafan and defendant initially denied
knowing the combination to the safe. However,
Kafan later supplied the combination, and defen-
dant admitted that the safe belonged to him (de-
fendant).

Both defendant and Kafan filed pretrial motions
for separate trials. Following a hearing, the trial

court denied severance. Kafan's attorney renewed the motion during trial after the prosecution rested its case, but the trial judge again denied the motion. Defendant was tried jointly with Kafan before a jury in February 1989.[1] Neither the defendant nor his brother testified. Defendant was convicted, as charged (as was Kafan).

The trial court imposed a prison term of from ten to thirty years for the delivery count and a nonparolable life sentence for possession of 650 or more grams of cocaine. Defendant appealed, alleging in pertinent part that the trial court erred in denying his motion for a separate trial. The Court of Appeals rejected defendant's severance claim and affirmed his conviction. Unpublished opinion per curiam, issued March 20, 1992 (Docket No. 119380).

Defendant's motion for a rehearing was denied, and he then filed a delayed application for leave to appeal with this Court. In an order dated June 28, 1993, we granted leave to appeal, consolidating this case with *People v Rode* and *People v Gallina*, for consideration of related issues concerning the severance of trials of criminal defendants. 442 Mich 935.

### B. *PEOPLE v RODE* AND *PEOPLE v GALLINA*

Following a joint trial before separate juries,

---

[1] The defendant was tried on an aiding and abetting theory. The prosecutor explained in closing argument:

> As to Durid Hana, it is the People's theory that the Defendant aided his brother in the delivery of cocaine in the sum of 225 to 649 grams of cocaine, that he provided support, advice and encouragement and took an active role in that delivery.
>
> It is further alleged that Durid Hana allowed a safe to be used for the storage of cocaine, that he had knowledge that the cocaine was being stored in that safe and that he had dominion and control over the contents of what was kept in that safe, as did his brother Kevin [sic] Hana.

defendants Eric Rode and Aldo Gallina were convicted of second-degree murder, MCL 750.317; MSA 28.549, and possession of a firearm during the commission of a felony, MCL 750.227b; MSA 28.424(2), stemming from the killing of a young man in Dearborn in 1989. An explanation of the relevant events is set forth in the Court of Appeals opinion:

> On July 2, 1989, defendants were riding around in a Chevrolet Camaro with some high school friends. The Camaro was owned by defendant Gallina's cousin, Frank Kuhne. Defendant Gallina, age fifteen, was seated in the front passenger seat, and defendant Rode, age sixteen, was in the back seat on the passenger side. A Ford Mustang pulled beside the Camaro and the Mustang's occupants, Edward and Charles Schramek, indicated that they wanted to race. When the cars were side by side, Charles and the other occupants of the Camaro began shouting at each other. Charles shouted, "You're lucky we don't pull our gun out and shoot you." At that point, defendant Gallina pulled a gun from the front panel of the car, where he knew his cousin kept it, and fired it out the window more than once. Defendant Rode then took the gun from defendant Gallina. Defendant Gallina testified that defendant Rode said, "If you are not going to shoot at them, I will." Defendant Rode fired the gun toward the tires of the Mustang.
>
> Defendant Rode testified that after he shot toward the tires, he gave the gun back to defendant Gallina, who shot the gun again. Defendant Rode then reloaded the gun with bullets supplied by defendant Gallina. The Mustang continued to follow the Camaro. The driver of the Camaro stopped the car suddenly, and, as the Mustang passed the driver's side of the Camaro, one of the defendants pulled himself up out of the passenger-side window and shot several times over the roof of the Camaro

into the passenger side of the Mustang. Charles was killed by one of these shots.

Each defendant testified after the prosecutor rested. Each denied firing the gun over the roof as the Mustang passed the Camaro, and each claimed that the other defendant fired the gun. Jonathan Warmack, who was driving the Camaro, testified that defendant Gallina did not fire the gun when the Mustang was passing. Warmack also testified that after the Mustang passed by, defendant Rode said, "I know I hit him." Brad Andrews, who was in the back seat of the Camaro on the driver's side, made a statement to the police wherein he said that defendant Rode fired the gun over the roof as the Mustang was passing. At trial, Andrews testified that he did not see defendant Rode fire the gun as the Mustang passed, but he did see defendant Gallina reach out the window and fire the gun once the Mustang had passed. James Kelly, who was seated in the middle of the Camaro's back seat, testified that defendant Gallina fired the gun over the roof as the Mustang was passing, and then defendant Rode leaned out the window and fired the gun as the Mustang drove off. [196 Mich App 58, 61-62; 492 NW2d 483 (1992).]

The defendants were charged with first-degree (premeditated) murder and with possession of a firearm during the commission of that felony. MCL 750.316, 750.227b; MSA 28.548, 28.424(2). As juveniles, they were processed under the automatic-waiver provisions. MCL 600.606, 764.1f, 712A.2(a)(1); MSA 27A.606, 28.860(6), 27.3178(598.2)(a)(1).[2]

Before trial, both defendants moved for sever-

---

[2] The prosecutor's decision to proceed in this manner was challenged by the defendants in the trial court. Defendants argued that the prosecutor was abusing his charging discretion by following an automatic policy of prosecuting as adults all fifteen- and sixteen-year-old juveniles who were being charged with first- or second-degree murder. The trial court granted no relief on this claim, and the Court of Appeals denied an interlocutory appeal.

ance, claiming that separate trials were necessary because of antagonistic defenses. Following two hearings on the issue, the trial court ruled that there would be a single trial at which separate juries would be impaneled.

A two-jury joint trial took place in November, 1989. Each jury returned a verdict finding its defendant guilty of second-degree murder and felony-firearm. The trial court conducted a dispositional hearing pursuant to MCL 769.1(3); MSA 28.1072(3); MCR 6.931, and concluded that defendants should be sentenced as adults. The court imposed sentences of life in prison for second-degree murder, as well as the mandatory two-year consecutive terms for felony-firearm.

Both defendants appealed, and the Court of Appeals reversed defendants' convictions, finding in pertinent part that the trial court erred in its decision to try the cases jointly with dual juries.

The prosecutor filed separate applications for leave to appeal with this Court. In an order entered June 28, 1993, we granted leave to appeal, limited to the issue whether the trial court erred in denying defendant's motion for separate trials. We further ordered that these cases be argued and submitted to the court together with the case of *People v Hana,* 442 Mich 935.

II

We granted leave to appeal in the instant cases to revisit an issue that has not been authoritatively addressed by this Court since 1976—the appropriate standard for severance of the trials of codefendants in criminal cases. Our reexamination is prompted, in part, by issuance of a recent United States Supreme Court decision, *Zafiro v United States,* 506 US 534; 113 S Ct 933; 122 L Ed

2d 317 (1993), which addresses the issue at hand. The prosecutors in the instant cases urge that we adopt the severance standard set forth in *Zafiro.* Our approach begins with a chronological overview of Michigan law as it pertains to severance.

The question of joinder and severance of defendants in criminal prosecutions in Michigan is addressed by statute. MCL 768.5; MSA 28.1028 provides that "[w]hen two or more defendants shall be jointly indicted for any criminal offense, they shall be tried separately or jointly, in the discretion of the court."[3]

Early decisions of this Court that interpreted the joinder statute (or earlier versions of it) emphasized not only the discretionary nature of a joinder decision but also uniformly required a defendant who moved for severance to demonstrate prejudice that would arise out of joinder. For instance, in *People v Mullane,* 256 Mich 54,

[3] This statute implicitly recognizes that "[j]oint trials play a vital role in the criminal justice system . . . ." *Richardson v Marsh,* 481 US 200, 209; 107 S Ct 1702; 95 L Ed 2d 176 (1987). As the *Richardson* Court explained,

It would impair both the efficiency and the fairness of the criminal justice system to require, in all these cases of joint crimes where incriminating statements exist, that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand. Joint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability—advantages which sometimes operate to the defendant's benefit. Even apart from these tactical considerations, joint trials generally serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts. [*Id.,* p 210.]

See also *Buchanan v Kentucky,* 483 US 402, 418-419; 107 S Ct 2906; 97 L Ed 2d 336 (1987). For an excellent discussion of the advantages and pitfalls of joint trials, see Dawson, *Joint trials of defendants in criminal cases: An analysis of efficiencies and prejudices,* 77 Mich L R 1379 (1979).

56; 239 NW 282 (1931), the defendant's counsel moved for a separate trial for his client, for the reason that he "has a good and meritorious defense and believes that his said defense would be prejudiced if he is compelled to go to trial with the other defendants." On appeal, it was held that the trial court did not abuse its discretion in denying the motion, because "[n]o affidavit, stating facts on which the court might determine whether the defenses relied on were inconsistent with each other and a joint trial might result in prejudice to one or more of them, was presented." *Id.* See also *People v Garska,* 303 Mich 313; 6 NW2d 527 (1942); *People v Kynerd,* 314 Mich 107; 22 NW2d 90 (1946); *People v Krugman,* 377 Mich 559; 141 NW2d 33 (1966).

In *People v Schram,* 378 Mich 145, 156; 142 NW2d 662 (1966), the Court added to prior authority the requirement that "in the absence of a showing of prejudice to substantial rights of the accused," a trial court's severance decision will not be reversed.

In 1976, the Court decided *People v Hurst,* 396 Mich 1; 238 NW2d 6 (1976), a pivotal case with regard to the present appeals because it focused on the standard for severance in the context of antagonistic defenses. In *Hurst,* the defendant and his wife were jointly tried and convicted by a jury of manslaughter with regard to the death of their young daughter. A motion by the prosecution for a joint trial was granted over an objection that the defenses were antagonistic. On appeal, this Court held that the trial judge erred in ordering a joint trial. The *Hurst* Court began its analysis with the general rule that

a defendant does not have a right to a separate trial. Joinder of defendants for trial is usually

within the discretion of the court. However, "[a] severance should be granted when the defenses of several defendants jointly indicted are antagonistic to each other." 5 Wharton's Criminal Law and Procedure, § 1946; Anno: *Right to severance where two or more persons are jointly accused,* 70 ALR 1171.

The commentary accompanying the American Bar Association Standards Relating to Joinder and Severance states: "it has long been the view that defendants joined for trial should be granted a severance whenever their defenses are antagonistic to each other." [*Id.,* p 6.][4]

*Hurst* cited several cases from other state jurisdictions supporting the proposition that a separate trial will be ordered where the defenses of the accused are antagonistic. *Id.,* pp 6-8. *Hurst* did not reference either the Michigan joinder statute, the Michigan precedent set forth above, or federal authority, in rendering its conclusion that error requiring reversal had occurred:

> While neither Kelker nor Hurst directly accused the other of causing Evelyn's death, the tendency of the testimony of each was to accuse the other of her death. By insisting on a joint trial, the state succeeded in pitting one defendant against the other, each trying to save himself at the detriment of the other.
>
> * * *
>
> Hurst was aware of Kelker's extrajudicial statements incriminating him and correctly anticipated that if the two were tried jointly she would testify to exculpate herself and incriminate him. The judge erred in ordering a joint trial over Hurst's objection. [*Id.,* p 9.]

---

[4] This statement has been deleted from the second edition of the ABA Standards Relating to Joinder and Severance, which now notes that antagonistic defenses are one of many factors to be considered in a severance decision. See ABA Standards for Criminal Justice (2d ed), Joinder and Severance, Standard 13-3.2(c), commentary, p 13-38.

We hold that in the circumstances Hurst was
denied a fair trial. A defendant is entitled to a
trial separate and apart from a codefendant who it
appears may testify to exculpate himself and in-
criminate the defendant seeking a separate trial.
[*Id.,* p 4.]

Three months after *Hurst* was decided, the
Court in *People v Carroll,* 396 Mich 408, 414; 240
NW2d 722 (1976), affirmed a joint trial, reiterating
the principles of *Schram, supra:*

Statutory authority for the exercise of the
court's discretion (MCL 768.5; MSA 28.1028) and
case law establishing a strong policy in favor of
joint trials are acknowledged by defendants. There
must be an affirmative showing of prejudice to
substantial rights of the accused. *People v Schram,*
378 Mich 145; 142 NW2d 662 (1966). The motion
here was based upon an allegation of inconsistent
defenses. The record discloses that the defenses
differed but were not inconsistent and no state-
ment was used by one defendant against another.
No abuse of discretion is demonstrated. [See also
*People v Wakeford,* 418 Mich 95, 119; 341 NW2d
68 (1983).]

In 1989, a new provision regarding joinder and
severance was added to chapter 6 of the revised
Michigan Court Rules. MCR 6.121 provides for
permissive joinder and conditional severance:

(A) Permissive Joinder. An information or in-
dictment may charge two or more defendants with
the same offense. . . . [T]wo or more informations
or indictments against different defendants may be
consolidated for a single trial whenever the defen-
dants could be charged in the same information or
indictment under this rule.

\* \* \*

(C) Right of Severance; Related Offenses. On a defendant's motion, the court must sever the trial of defendants on related offenses on a showing that severance is necessary to avoid prejudice to substantial rights of the defendant.

(D) Discretionary Severance. On the motion of any party, the court may sever the trial of defendants on the ground that severance is appropriate to promote fairness to the parties and a fair determination of the guilt or innocence of one or more of the defendants. Relevant factors include the timeliness of the motion, the drain on the parties' resources, the potential for confusion or prejudice stemming from either the number of defendants or the complexity or nature of the evidence, the convenience of the witnesses, and the parties' readiness for trial.

As indicated by the staff comment accompanying MCR 6.121(C), the new court rule incorporated the principles set forth in prior case law:

Subrule (C) sets forth a defendant's entitlement to a separate trial, if not obtainable pursuant to subrule (B), on a showing that it "is necessary to avoid prejudice to substantial rights of the defendant." This standard is taken from *People v Schram,* 378 Mich 145, 156 (1966), and *People v Carroll,* 396 Mich 408, 414 (1976). It is said to reflect a strong policy in favor of joint trials set forth in MCL 768.5; MSA 28.1028 and found in case law. The right of a defendant to a fair trial and other substantial rights, however, may necessitate severance. See, for example, *People v Hurst,* 396 Mich 1, 4 (1976), stating that a defendant is entitled to a separate trial if it appears that a codefendant "may testify to exculpate himself and incriminate the defendant seeking a separate trial."

In 1993, while the defendants' applications were pending in this Court, the United States Supreme

Court decided *Zafiro, supra,* in which it addressed the matter of severance in the context of mutually antagonistic defenses. The four defendants in *Zafiro* were jointly tried pursuant to rule 8(b) of the Federal Rules of Criminal Procedure, which provides that defendants may be charged together "if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." *Id.,* 122 L Ed 2d 322-323. The defendants argued that their defenses were mutually antagonistic and moved for severance under rule 14, which specifies that "[i]f it appears that a defendant or the government is prejudiced by a joinder of . . . defendants . . . for trial . . . the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires."[5] *Id.,* 122 L Ed 2d 324. The district court denied the motions, and each defendant was convicted of various drug-related offenses.[6]

---

[5] FR Crim P 14 provides in full:

Relief from Prejudicial Joinder

If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection in camera any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial.

[6] The trial of the four defendants proceeded in the following fashion, as described by the Court:

At various points during the proceeding, Garcia and Soto moved for severance, arguing that their defenses were mutually antagonistic. Soto testified that he knew nothing about the drug conspiracy. He claimed that Garcia had asked him for a

The Supreme Court ultimately affirmed the denial of severance. The *Zafiro* Court preliminarily noted that there is a "preference in the federal system for joint trials of defendants who are indicted together," but at the same time acknowledged that rule 14 recognizes that joinder may prejudice either a defendant or the government. *Id.* The Court, however, refused to interpret rule 14 as requiring severance as a matter of law when codefendants present mutually antagonistic defenses:

> [P]etitioners urge us to adopt a bright-line rule, mandating severance whenever codefendants have conflicting defenses. . . . We decline to do so. Mutually antagonistic defenses are not prejudicial per se. Moreover, Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion. . . .
>
> We believe that, when defendants properly have been joined under Rule 8(b), a district court should grant a severance under Rule 14 *only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence. [Id.,* 122 L Ed 2d 325. Emphasis added.]

box, which he gave Garcia, and that he (Soto) did not know its contents until they were arrested. Garcia did not testify, but his lawyer argued that Garcia was innocent: The box belonged to Soto and Garcia was ignorant of its contents.

Zafiro and Martinez also repeatedly moved for severance on the ground that their defenses were mutually antagonistic. Zafiro testified that she was merely Martinez's girlfriend and knew nothing of the conspiracy. She claimed that Martinez stayed in her apartment occasionally, kept some clothes there, and gave her small amounts of money. Although she allowed Martinez to store a suitcase in her closet, she testified, she had no idea that the suitcase contained illegal drugs. Like Garcia, Martinez did not testify. But his lawyer argued that Martinez was only visiting his girlfriend and had no idea that she was involved in distributing drugs. [*Id.,* 122 L Ed 2d 323.]

The prosecutors in the instant cases urge this Court to adopt the *Zafiro* standard; defendants, on the other hand, rely on *Hurst, supra,* as mandating severance whenever codefendants have antagonistic defenses.

In arriving at the appropriate standard, it is necessary to compare the framework for the *Zafiro* decision, rule 14, with Michigan's counterpart, MCR 6.121(C) and (D). MCR 6.121(C) provides that "[o]n a defendant's motion, the court must sever the trial of defendants on related offenses on a showing that severance is necessary to avoid prejudice to substantial rights of the defendant." MCR 6.121(D) provides that "any party" may invoke the court's discretion to grant separate trials on the ground that it will "promote fairness to the parties and a fair determination of the guilt or innocence of one or more of the defendants." Rule 14 provides that "[i]f it appears that a defendant or the government is prejudiced by a joinder of . . . defendants . . . the court may . . . grant a severance of defendants or provide whatever other relief justice requires."

The first observation to be drawn from a comparison is that rule 14 is substantively compatible with MCR 6.121(C) and (D). MCR 6.121(C) incorporates a prejudice requirement, as does rule 14. MCR 6.121(D) and rule 14 both provide for discretionary severance. However, MCR 6.121(C) actually imposes a heightened requirement in that severance is mandated only when a defendant makes "a showing that severance is *necessary* to avoid prejudice to *substantial rights* of the defendant." A defendant must not only demonstrate that "substantial rights" have been detrimentally affected, but also that severance is "necessary," i.e., that there is no other available avenue of relief. These requirements of MCR 6.121(C) bear

close resemblance to the *Zafiro* standard, grafted
on rule 14, that severance should be granted "only
if there is a serious risk that a joint trial would
compromise a specific trial right . . . or prevent
the jury from making a reliable judgment about
guilt or innocence." *Id.,* 122 L Ed 2d 325. Our
conclusion is that while the *Zafiro* decision pre-
sents a newly formulated strict standard for sever-
ance as it relates to rule 14, it is comparable to the
standard that already exists in Michigan.

We therefore hold that, pursuant to MCL 768.5;
MSA 28.1028, and MCR 6.121(D), the decision to
sever or join defendants lies within the discretion
of the trial court. Severance is mandated under
MCR 6.121(C) only when a defendant provides the
court with a supporting affidavit, or makes an offer
of proof, that clearly, affirmatively, and fully dem-
onstrates that his substantial rights will be preju-
diced and that severance is the necessary means of
rectifying the potential prejudice.[7] The failure to

---

[7] The *Zafiro* Court offered examples, transferable to the Michigan
standard, of potentially reversible prejudice:

> Such a risk might occur when evidence that the jury should
> not consider against a defendant and that would not be admis-
> sible if a defendant were tried alone is admitted against a
> codefendant. For example, evidence of a codefendant's wrongdo-
> ing in some circumstances erroneously could lead a jury to
> conclude that a defendant was guilty. When many defendants
> are tried together in a complex case and they have markedly
> different degrees of culpability, this risk of prejudice is height-
> ened. See *Kotteakos v United States,* 328 US 750, 774-775; 66 S
> Ct 1239; 90 L Ed 1557 (1946). Evidence that is probative of a
> defendant's guilt but technically admissible only against a
> codefendant also might present a risk of prejudice. See *Bruton
> v United States,* 391 US 123; 88 S Ct 1620; 20 L Ed 2d 476
> (1968). Conversely, a defendant might suffer prejudice if essen-
> tial exculpatory evidence that would be available to a defen-
> dant tried alone were unavailable in a joint trial. See, e.g.,
> *Tifford v Wainwright,* 588 F2d 954 (CA 5, 1979) (per curiam).
> The risk of prejudice will vary with the facts in each case, and
> district courts may find prejudice in situations not discussed
> here. [*Id.,* 122 L Ed 2d 325.]

See also *United States v Sherlock,* 865 F2d 1069, 1077 (CA 9, 1989).

make this showing in the trial court, absent any significant indication on appeal that the requisite prejudice in fact occurred at trial, will preclude reversal of a joinder decision.

While we recognize that a joint trial of codefendants presenting antagonistic defenses has serious negative implications for the accused,[8] the standard for severance is not lessened in this situation. Despite the fact that *Hurst* was premised on the general rule that a defendant does not have a

---

[8] In *United States v Tootick,* 952 F2d 1078, 1082-1083 (CA 9, 1991), the practical considerations that create prejudice were discussed in detail:

Defendants who accuse each other bring the effect of a second prosecutor into the case with respect to their codefendant. In order to zealously represent his client, each codefendant's counsel must do everything possible to convict the other defendant. . . .

Cross-examination of the government's witnesses becomes an opportunity to emphasize the exclusive guilt of the other defendant or to help rehabilitate a witness that has been impeached. Cross-examination of the defendant's witnesses provides further opportunities for impeachment and the ability to undermine the defendant's case. . . .

Joinder can provide the individual defendants with perverse incentives. Defendants do not simply want to demonstrate their own innocence, they want to do everything possible to convict their codefendants. These incentives may influence the decision whether or not to take the stand, as well as the truth and content of the testimony.

The joint trial of defendants advocating mutually exclusive defenses produces fringe benefits for the prosecution. Joinder in these cases can make a complex case seem simple to the jury: convict them both.

The government's case becomes the only unified and consistent presentation. . . .

Joinder of defendants who assert mutually exclusive defenses has a final subtle effect. All evidence having the effect of exonerating one defendant implicitly indicts the other. The defendant must not only contend with the effects of the government's case against him, but he must also confront the negative effects of the codefendant's case.

See also Dawson, n 3 *supra,* pp 1422-1426; *Zafiro, supra,* 122 L Ed 2d 328 (concurring opinion of Stevens, J.). Cf. *Krulewitch v United States,* 336 US 440, 454; 69 S Ct 716; 93 L Ed 790 (1949).

right to a separate trial, *id.,* p 6, we are cognizant of the fact that some lower courts have interpreted *Hurst* as establishing what is tantamount to a severance rule per se in antagonistic defense cases.

For instance, in *People v Espinosa,* 142 Mich App 99, 104; 369 NW2d 265 (1985), the Court found that even though there was no evidence of mutually antagonistic defenses and neither of the defendants testified, where each of the two defendant's attorneys wanted to argue the theory "from the confused recollections of the various witnesses" that the other defendant did the greater harm, joinder violated due process because "[t]he prosecutor's task was thereby made easier by the improper joinder." *Id.,* p 106. On the basis of *Hurst,* the *Espinosa* Court concluded, "even where the defendants do not directly accuse one another of being the guilty party, the court should order separate trials if the proofs, combined with the defense theories, pit the defendants against each other." *Id.,* p 104. Because each defense lawyer in a joint trial will inevitably put his client's spin on a witnesses' testimony (thereby helping the prosecutor's case), taken literally, *Espinosa* would always require severance. See also *People v Muhammad,* 170 Mich App 747, 759; 428 NW2d 762 (1988); *People v Jackson,* 158 Mich App 544; 405 NW2d 192 (1987).

To the extent that these cases have interpreted *Hurst* as authority for a severance rule per se when antagonistic defenses are alleged, we disavow such a rationale. We note that the majority of lower court decisions following in the wake of *Hurst* have adhered to the prejudice requirement of *Schram* and *Carroll* even where antagonistic defenses are involved. See, e.g., *People v Greenberg,* 176 Mich App 296; 439 NW2d 336 (1989); *People v Byrd,* 133 Mich App 767; 350 NW2d 802

(1984); *People v Partee,* 130 Mich App 119; 342 NW2d 903 (1983); *People v Gibbs,* 120 Mich App 485; 328 NW2d 65 (1982); *People v American Medical Centers of Michigan, Ltd,* 118 Mich App 135; 324 NW2d 782 (1982), cert den sub nom *Fuentes v Michigan,* 464 US 1009 (1983); *People v Larry Kramer,* 108 Mich App 240; 310 NW2d 347 (1981); *People v Jeffrey Kramer,* 103 Mich App 747; 303 NW2d 880 (1981); *People v Dunlap,* 87 Mich App 528; 274 NW2d 62 (1978); *People v Moore,* 78 Mich App 294; 259 NW2d 351 (1977); *People v Gunter,* 76 Mich App 483; 257 NW2d 133 (1977).

Inconsistency of defenses is not enough to mandate severance; rather, the defenses must be "mutually exclusive" or "irreconcilable." See, e.g., *United States v Arias-Villanueva,* 998 F2d 1491, 1506 (CA 9, 1993); *United States v Warner,* 955 F2d 441 (CA 6, 1992); *United States v Sherlock,* 865 F2d 1069 (CA 9, 1989); *United States v Spitler,* 800 F2d 1267 (CA 4, 1986); *United States v Vadino,* 680 F2d 1329 (CA 11, 1982); *United States v Mota,* 598 F2d 995 (CA 5, 1979). Moreover, "[i]ncidental spillover prejudice, which is almost inevitable in a multi-defendant trial, does not suffice." *United States v Yefsky,* 994 F2d 885, 896 (CA 1, 1993). The "tension between defenses must be so great that a jury would have to believe one defendant at the expense of the other." *Id.,* p 897. Otherwise stated,

> "It is natural that defendants accused of the same crime and tried together will attempt to escape conviction by pointing the finger at each other. Whenever this occurs the co-defendants are, to some extent, forced to defend against their co-defendant as well as the government. This situation results in the sort of compelling prejudice requiring reversal, however, only when the com-

peting defenses are so antagonistic at their cores that both cannot be believed. Consequently, we hold that a defendant seeking severance based on antagonistic defenses must demonstrate that his or her defense is so antagonistic to the co-defendants that the defenses are mutually exclusive. Moreover, defenses are mutually exclusive within the meaning of this rule if the jury, in order to believe the core of the evidence offered on behalf of one defendant, must disbelieve the core of the evidence offered on behalf of the co-defendant." [*State v Kinkade,* 140 Ariz 91, 93; 680 P2d 801 (1984).]

The *Zafiro* Court offered further insight into the nature of antagonistic defenses when it responded to the defendant's theory that, when two defendants both claim they are innocent and each accuses the other of the crime, a jury will conclude (1) that both defendants are lying and convict them both on that basis, or (2) that at least one of the two must be guilty without regard to whether the government has proved its case beyond a reasonable doubt. The Court dismissed the notion that the very nature of their defenses, without more, prejudiced them. As to the first contention, the Court responded:

[I]t is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials. . . . While "[a]n important element of a fair trial is that a jury consider only relevant and competent evidence bearing on the issue of guilt or innocence," . . . a fair trial does not include the right to exclude relevant and competent evidence. A defendant normally would not be entitled to exclude the testimony of a former codefendant if the district court did sever their trials, and we see no reason why relevant and competent testimony would be prejudicial merely because the witness is also a codefendant. [*Zafiro, supra,* 122 L Ed 2d 326.]

With regard to the second contention, the Court answered:

> The Government argued that all four petitioners were guilty and offered sufficient evidence as to all four petitioners; the jury in turn found all four petitioners guilty of various offenses. Moreover, even if there were some risk of prejudice, here it is of the type that can be cured with proper instructions, and "juries are presumed to follow their instructions." *Richardson* [*v Marsh,* 481 US 200, 211; 107 S Ct 1702; 95 L Ed 2d 176 (1987)]. The District Court properly instructed the jury. . . . These instructions sufficed to cure any possibility of prejudice. [*Id.,* 122 L Ed 2d 326.]

The risk of prejudice may not only be allayed by proper instructions,[9] but by the use of dual juries as well. This procedure has been successfully used in Michigan. See, e.g., *People v Greenberg, supra; People v Jeffrey Kramer, supra,* pp 754-755; *People v Brooks,* 92 Mich App 393, 396-397; 285 NW2d 307 (1979). See, generally, anno: *Propriety of use of multiple juries at joint trial of multiple defendants in state criminal prosecution,* 41 ALR4th 1189; anno: *Propriety of use of multiple juries at joint trial of multiple defendants in federal criminal case,* 72 ALR Fed 875. See also ABA Standards for Criminal Justice (2d ed), Joinder and Severance, Standard 13-3.2(c), commentary, p 13-38. The use of separate juries is a partial form of severance to be evaluated under the standard, set forth above, applicable to motions for separate trials. *United States v Rowan,* 518 F2d 685, 690 (CA 6, 1975); *Kramer, supra.* The dual-jury procedure should be scrutinized with the same concern in mind that tempers a severance motion, i.e., whether it has

---

[9] See *Zafiro, supra,* 122 L Ed 2d 325-326. Cf. *People v Manning,* 434 Mich 1, 8; 450 NW2d 534 (1990).

prejudiced the substantial rights of the defendant.
The precise issue is whether there was prejudice to
substantial rights after the dual-jury system was
employed.

With these stated principles in mind, we turn to
the facts of the cases at hand.

### III

#### A. *PEOPLE v HANA*

Before trial, both defendant and his brother
Kafan moved for severance of their trials. In a
supporting affidavit, defendant's counsel explained
the results of a meeting that he had with Kafan's
attorneys:

> At said meeting affiant was advised by both
> counsel that the defense theory of the above case
> was that evidence would show, or would be consis-
> tent with a reasonable conclusion that, the con-
> trolled substances seized from 3105 Metropolitan
> Parkway were the property of, or possessed by,
> Durid Bajhat Hana and not by Kafan Hana.
>
> Given the fact that Durid Bajhat Hana's theory
> of the case is that the evidence will show, or will
> be consistent with a reasonable conclusion that,
> the controlled substances seized from 3105 Metro-
> politan Parkway were the property of, or possessed
> by, Kafan Hana, and not by Durid Bajhat Hana,
> Durid Bajhat Hana will be compelled to act, for all
> practical purpose, as an assistant prosecutor as to
> the co-defendant, Kafan Hana, and will be unable
> to equitably and fairly conduct his defense absent
> this dichotomy of purpose.

The trial court heard argument on the motions.
At the proceeding, Kafan's attorney argued:

> It's our theory of defense that the cocaine in the
> safe belonged to Durid Hana, and I understand

that it's Mr. Durid Hana's defense that the cocaine
in the safe belonged to our client Kafan Hana. The
two defenses could not be more antagonistic. Those
were the identical facts in [the *Hurst*] drug case
where two people are pointing the finger at each
other and the case is clear that severance must be
granted.

The prosecutor argued that it took more than "a
mere allegation of pointing fingers at one another"
to warrant separate trials. After further discus-
sion, defendant's counsel stated:

Your Honor, if I may, I think in the interest of
judicial economy, perhaps we can also add on
behalf of Mr. Durid Hana, he has filed a parallel
motion to sever. Mr. Hana's present intention to
take the stand, I think, further buttresses the
antagonistic nature of the antagonistic defenses. I
think it would be very, very chilling to the equita-
ble administration of this case for the severance to
be denied. I think the [*Hurst*] case is on point. I
believe it's definitely a requirement, given the
position of the two parties, that these cases be
severed for trial.

The trial court took the matter under advise-
ment and later denied the motion. Kafan's attor-
ney renewed the motion for severance at trial,
after the prosecution rested, and the court again
denied the motion.

At trial, neither defendant nor his brother testi-
fied. However, defendant points to the following
events during trial that, he alleges, created a
strong inference of mutually antagonistic defenses.

In his opening statement, Kafan's attorney told
jurors that their deliberations necessarily pitted
brother against brother. During closing argument,
defendant's attorney similarly described the defen-
dant's relative postures as "brother pitted against

brother." The closing argument of Kafan's attorney included an attack on the theory that his client had control over the three kilograms of cocaine seized from the safe:

> We know he used the Cadillac, we know he used the house, we know he used the safe, but we know he didn't own the Cadillac and own the house and own the safe. . . . Everybody who has ever shared a locker in school or anybody who's ever shared an apartment, everybody who's ever lived in a rooming house and had to share a bathroom knows that you can share special areas and have absolutely no right to control something that belongs to somebody else . . . .

The prosecutor pointed out the conflict during rebuttal closing argument when she noted: "That's real convenient for these two boys to sit here and say that the drugs belonged to one another." This remark was stricken. The prosecutor later stated:

> The position that Durid Hana and Kevin [sic] Hana had taken in this trial is saying that the drugs did not belong to them, but they were in their bedroom and they were in a safe that they both had access to, and if you believe both Durid Hana and Kevin Hana, the good fairy must have delivered the drugs and locked them in the safe. It's not reasonable to believe that they did not know that they were there. Someone had put those drugs in that safe, and if you look at all of the evidence that occurred that night, it is reasonable to believe that both of them knew it.

Defendant argues that it is not dispositive that neither he nor Kafan actually testified against one another because the evidence pitted them against one another; in order for one to be acquitted, the jury had to find that the narcotics belonged exclusively to the other.

Our conclusion, however, is to the contrary. The affidavit submitted by defendant in support of his motion for severance was conclusory in nature. It lacked sufficient specificity to enable the trial court to accurately determine what the defenses would be, how the defenses would affect each other, and whether the defendants' respective positions were indeed mutually exclusive or merely inconsistent. Potentially prejudicial evidence, either physical or testimonial, was not substantiated by the affidavit or at the hearing. A trial court ruling on a pretrial motion must have concrete facts on which to base a ruling; mere finger pointing does not suffice. In the absence of proof that clearly, affirmatively, and fully demonstrated that defendant's substantial rights were prejudiced and that severance was necessary, we will not interfere with the trial court's discretion.

With the benefit of hindsight, we further find that defendant was not irretrievably prejudiced at trial. Neither defendant testified, so there were no express cross-accusations. Indeed, apart from the noted comments of respective counsel in their opening statements and summations, there was nothing inherently antagonistic in the evidence adduced at trial. The most obvious points of conflict were the statements made by defendant and his brother to the police that were admitted at trial. Defendant's statement, written into the officer's report, was as follows:

> "Mr. Hana, after being advised of his rights, when asked about the safe that was found in his bedroom, stated that the safe belonged to him and that he knew the combination of it. He stated he kept his mother's jewelry, some personal papers and blank checks in the safe. He denied knowing there were three kilos of suspected cocaine in the safe. He said he shares the bedroom with his

brother but he had no idea what his brother was doing."

Police testimony established that Kafan made statements indicating that there were three kilograms of cocaine in the safe and that he (Kafan) was "a dead man." Kafan never made a statement or even inferred that the drugs did not belong to him or were the sole property of his brother. Consequently, the defenses did not rise to the level of mutual or irreconcilable antagonism. We further note that virtually all the state's evidence was admissible against both defendants. Finally, for reasons already recognized in our discussion of *Espinosa, supra,* the attorneys' verbal tug of war did not transform the proceedings into an unfair trial for the defendant. With the cautionary instructions that were given by the trial court concerning reasonable doubt and the determination of guilt or innocence on an individual basis, the jury could reasonably be expected to compartmentalize the evidence pertaining to each defendant.

We therefore affirm the decision of the Court of Appeals denying defendant's motion for a separate trial.

### B. *PEOPLE v RODE* AND *PEOPLE v GALLINA*

Defendants Rode and Gallina each submitted pretrial motions for separate trials, asserting that antagonistic defenses would be presented during trial. In response to the motions, the trial court ordered that separate juries would be impaneled to hear the cases against the two codefendants.

When the trial commenced, separate juries were selected from the same venire. Voir dire was conducted in the presence of potential jurors for both defendants, over defense objection. Before the pre-

sentation of any evidence, the prosecutor moved to amend his witness list to endorse each defendant as a witness against the other. The prosecutor indicated, on the record, his realization that he could not call the codefendants in his case in chief because they could exercise their Fifth Amendment rights not to testify. The prosecutor stated that if either defendant chose to testify in his own behalf, he wished to reopen his proofs so that one defendant's testimony could be presented in front of the codefendant's jury. The court ruled that the prosecutor's motion would be granted if the defendants chose to testify.

The attorneys presented separate opening arguments to the respective juries. Near the close of the state's case, the prosecutor asked on the record, outside the presence of both juries, whether each codefendant would exercise his Fifth Amendment rights if called by the prosecution as a witness before the other's jury. Both defense attorneys indicated that their clients would refuse to testify if called during the prosecution's case in chief.

After the prosecution rested, defendant Rode presented his case. Defendant Gallina's jury was removed during the presentation of defendant's defense, until defendant Rode himself was called to testify. At that point, the prosecutor again raised his request to reopen his proofs to call defendant Rode as a witness against defendant Gallina. Once the court determined that defendant Rode was indeed going to give substantive testimony, he granted the prosecution's request. The trial court ruled that defendant Rode's testimony would be presented only one time, before both juries, with defendant Rode's counsel conducting the direct examination and the prosecutor and defendant Gallina's counsel doing cross-examina-

tion. The testimony proceeded accordingly, with defendant Rode denying that he fired any shots at the Mustang and asserting that defendant Gallina fired the fatal shots. Later in the trial, the testimony of defendant Gallina, inculpating defendant Rode, was presented in front of both juries under the same procedure.[10]

During the prosecution's case, a police officer testified, relating a statement given by defendant Gallina that was consistent with Gallina's live testimony. This statement was read only in the presence of the Gallina jury.

Both juries heard cross-examination of the decedent's brother by defendant Rode's attorney that on the night of the shooting he told the police that the front seat passenger shot his brother. This testimony was presented over defense objection and a request by defendant Rode's attorney at a side-bar conference that the Gallina jury be removed before he began this line of cross-examination. The testimony was elicited by defendant Rode

[10] Defendant Rode contended on appeal that the trial court erred in permitting the prosecution to amend its witness list on the first day of trial to endorse each defendant as a witness in the codefendant's case. The Court of Appeals agreed, finding that the prosecutor had not shown good cause to justify his motion for the late addition. In light of defendants' antagonistic defenses and the expectation that the respective juries would not hear evidence presented during the codefendant's case, defendants were forced by the trial court's ruling to significantly change their strategy. 196 Mich App 67-68.

MCL 767.40a(3); MSA 28.980(1)(3) requires the prosecutor to send to the defendants, not less than thirty days before trial, a list of the witnesses the prosecutor intends to produce at trial. However, MCL 767.40a(4); MSA 28.980(1)(4) allows a prosecutor to add or delete from the witness list at any time upon leave of the court and for good cause shown. Even if this statute is violated, a defendant must show prejudice from the violation. *People v Williams,* 188 Mich App 54, 58-59; 469 NW2d 4 (1991).

Contrary to the Court of Appeals conclusion on this point, defendant Rode has not demonstrated the requisite prejudice under these circumstances. The amendment to the witness list did not force either defendant to testify. Moreover, even if the motion was not granted at the beginning of the trial, it could have been granted when either defendant decided to take the stand.

as part of his defense theory that defendant Gallina (the front seat passenger) was the only guilty party.

Defendants now maintain that had separate trials been granted, the juries would not have heard the voir dire concerning the inconsistent theories, the cross-examination of each witness (particularly the decedent's brother) by the co-defendant's counsel and the testimony of each codefendant. Defendants maintain that sufficient procedural safeguards were not implemented to effectively protect each jury from hearing the antagonistic defense of the codefendant. Consequently, the juries knew that only one defendant had fired the fatal shot and that each defendant claimed the other had done it. Each defendant therefore had to convince his jury not only that he did not fire the fatal shot, but that the other defendant did and was not to be believed.

In evaluating the alleged prejudice incurred by defendants Gallina and Rode through the use of separate juries, the question presented in this situation must be identified precisely. As noted above, the dual-jury procedure is a partial form of severance, to be evaluated under the standard applicable to motions for separate trials. The issue is whether there was prejudice to substantial rights after the dual-jury system was employed.

In his dissenting opinion, Justice LEVIN frames the inquiry as whether dual juries afforded the same protection to the defendants' rights as there would have been through separate trials. *Post* at 383. This inquiry, so stated, begs the question what that protection is. In response, we reiterate that, stated in practical terms, severance should be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from mak-

ing a reliable judgment about guilt or innocence."
*Zafiro, supra,* 122 L Ed 2d 325. See text, *supra,* p
346 and n 7. Otherwise stated, "the defendant
'must show that the magnitude of the prejudice
denied him a fair trial.' . . . [R]eversible prejudice
exists when one of the defendant's 'substantive
rights,' such as the 'opportunity to present an
individual defense,' is violated." *United States v
Tootick,* 952 F2d 1078, 1082 (CA 9, 1991) (citations
omitted).

In the instant case, the defendants, and the
dissent, fail to demonstrate what trial rights were
violated by the dual-jury procedure or how the
juries' determinations were unreliable. There is no
indication that either defendant was restricted in
his presentation of a defense, nor was either jury
exposed to evidence that would have been barred
from their considerations in separate trials.

The presence of two juries· in the defendants'
cases is significant. Where mutually antagonistic
defenses are presented in a joint trial, there is a
heightened potential that a single jury may con-
vict· one defendant, despite the absence of proof
beyond a reasonable doubt, in order to rationalize
the acquittal of another. That dilemma is not
presented to dual juries. Each jury is concerned
only with the culpability of one defendant; thus,
they both can find the defendants innocent or
guilty without the uneasiness of inconsistency that
would be presented to a single jury in a joint trial.
The chance for prejudice is therefore significantly
lessened.

The risk of prejudice is reduced even more in
these cases by the significant fact that the pros-
ecutor charged defendant Gallina as an aider and
abettor, MCL 767.39; MSA 28.979, and did not
contend that he fired the fatal shot. Finger point-
ing by the defendants when such a prosecution

theory is pursued does not create mutually exclusive antagonistic defenses. The properly instructed jury could have found both defendants similarly liable without any prejudice or inconsistency because one found guilty of aiding and abetting can also be held liable as a principal.

Moreover, even as the defendants recognize, when each defendant testified before his own jury, he thereby waived his Fifth Amendment rights regarding the events in question. Thereafter, it became permissible for the prosecution to call that defendant as a witness in the trial of the codefendant. As the *Zafiro* Court noted, "[a] defendant normally would not be entitled to exclude the testimony of a former codefendant if the district court did sever their trials, and we see no reason why relevant and competent testimony would be prejudicial merely because the witness is also a codefendant." *Zafiro, supra,* 122 L Ed 2d 326.

The defendants argue that had the trial court elected to order separate trials rather than separate juries, the jury of the defendant who was tried first would presumably not have heard any testimony from the codefendant, because the codefendant would most likely have exercised his Fifth Amendment right pending his own trial.

However, this Court cannot employ "what if" speculation as the basis for a severance rule. Were we to do so, prejudice could always be imagined, and the option of severance would be virtually foreclosed.

Similarly, the theories set forth in the dissenting opinion regarding what the prosecutor would have introduced or not introduced at a separate trial is pure speculation. The dissent focuses exclusively on the cross-examination of prosecution witnesses by codefendants' counsel as the prejudicial events, theorizing that impeachment evidence introduced

by defense counsel probably would not have been introduced for consideration by the respective juries if there had been separate trials. However, "a fair trial does not include the right to exclude relevant and competent evidence." *Zafiro,* 122 L Ed 2d 326. All of the evidence and testimony admitted at the dual trial would have been available for use at either of the defendants' separate trials. It is not dispositive that the evidence was presented here by counsel for a codefendant, rather than the prosecutor. None of the evidence was "probative of a defendant's guilt but technically admissible only against a codefendant," *Zafiro,* 122 L Ed 2d 325, as a possible basis for severance. Nor were the defendants barred from presenting "essentially exculpatory evidence that would be available to a defendant tried alone, but unavailable in a joint trial." *Id.*

Finally, the trial court's decision to utilize a single jury venire did not substantially prejudice the defendants. The questions pursued by both defendants' counsel during this procedure neither expressly nor implicitly addressed the topic of the alleged conflicting defenses that would be presented at trial.

In conclusion, although we certainly recognize the potential for confusion in the dual-jury procedure, we do not find such circumstances in the instant cases. The defendants were given every opportunity to present complete defenses before their respective juries, and they have failed to demonstrate how the juries' abilities to render fair decisions were adversely affected. The dual-jury procedure had the advantage of presenting the state's case, which was equally admissible against both defendants, in one setting, with all witnesses testifying at only a single proceeding. The appropriate cautionary instructions were given, with the

reasonable presumption that the juries followed these instructions to consider the evidence against each defendant separately.

In the absence of demonstrated prejudice to the defendants' substantial rights, we hold that the trial court did not abuse its discretion in conducting a joint trial with separate juries under these circumstances.

The decision of the Court of Appeals is therefore reversed.

BRICKLEY, BOYLE, RILEY, and MALLETT, JJ., concurred with GRIFFIN, J.

LEVIN, J. (*dissenting*). These cases, consolidated on appeal, concern related but distinct questions about a defendant's right to a separate trial. The question presented in *Hana* is whether the trial court should have granted the defendants' motions for severance under the circumstance that the defenses were so antagonistic that if the jury were to accept one of the defendant's defenses, it would have to convict the other. I would hold that the trial court erred in refusing to grant the defendants' motions for separate trials.

The question presented in *Rode/Gallina* is whether the trial court's administration of a dual-jury trial provided the defendants the same protections that they would have enjoyed had they been tried separately. I would hold that, on the facts of this case, the dual-jury procedure did not afford the defendants the same protection they would have enjoyed in separate trials.

I

Defendant Durid Hana was convicted of possession of over 650 grams of cocaine and delivery of over 255 grams but less than 650 grams of cocaine.

Hana's conviction arose out of a controlled drug purchase in his Sterling Heights home in January, 1988. After the controlled purchase, the police obtained a warrant and searched Hana's home. In a safe in the closet of a bedroom shared by Durid Hana and his brother Kafan, the police found a bag containing cocaine. Following the seizure of the cocaine from the safe, Hana was arrested and charged along with his brother Kafan.

Durid and Kafan were tried together before the same jury. Before the trial, the lawyers for both Hana brothers moved for separate trials. The lawyers submitted affidavits indicating that the brothers planned on pursuing mutually antagonistic defenses: each was going to claim to have been ignorant of the cocaine in the safe and that the other had sole possession of the cocaine. The trial court denied the motions.

At trial, the prosecution argued that its evidence tended to establish that *both* the Hana brothers knew that the cocaine was in the safe and, further, that both brothers jointly possessed the cocaine. Though neither defendant testified, through their attorneys' opening and closing statements and cross-examination, each denied any knowledge of the cocaine and insinuated that the other had sole possession of the drugs.[1]

The jury convicted both brothers, and the trial court sentenced Durid Hana to ten to thirty years for the delivery conviction and to nonparolable life for the possession of over 650 grams conviction.

The Court of Appeals affirmed.[2]

## II

Eric Rode and Aldo Gallina were charged with

[1] See part V for a detailed discussion of the conflicting defenses.

[2] Unpublished opinion per curiam, issued March 20, 1992 (Docket No. 119380).

first-degree murder arising out of the death of
Charles Schramek. As Schramek was riding in an
automobile driven by his brother Edward, he was
killed by a gunshot from a Chevrolet Camaro in
which Rode, Gallina, and three of their friends
were riding. Rode and Gallina were the only pas-
sengers in the Camaro who fired shots anywhere
in the vicinity of the automobile in which Schra-
mek was riding, and it was thus undisputed that
either Rode or Gallina fired the fatal shot.

The prosecution's theory was that Rode fired the
fatal shot and that Gallina aided and abetted Rode
either by handing Rode the gun with knowledge
that Rode intended to shoot at the Schrameks or
by providing bullets to Jimmy Kelly, who was
seated next to Rode, so that Kelly could reload the
gun for Rode.

Before the trial, the lawyers for both Rode and
Gallina moved for separate trials pursuant to this
Court's decision in *People v Hurst,* 396 Mich 1; 238
NW2d 6 (1976), stating that they were going to
present antagonistic defenses: both were going to
deny firing the fatal shot, and each was going to
claim that the other fired the fatal shot. The
prosecution did *not* oppose these motions, and the
trial court ruled that Gallina and Rode would be
tried together but by *separate* juries.

Both defense attorneys also made the following
requests:

1) that the juries be chosen from separate
   venires;
2) that the court remove one defendant's jury
   from the courtroom while the other defen-
   dant's lawyer was cross-examining the
   prosecution's witnesses;

3) that neither jury be permitted to hear the testimony of the defendant in whose case they were not sitting (i.e., Gallina's jury would not be permitted to hear Rode's testimony and vice versa).[3]

The trial court refused to pick the juries from separate venires. It agreed that the juries could be excused during cross-examination as requested as long as each defendant's lawyer gave notice that his cross-examination would incriminate the codefendant. Later, in the course of the proceedings, the court ruled that each jury could hear the testimony of *both* defendants.

The juries were picked from a single venire. Rode's jury heard the opening and closing statements of Rode's lawyer but not Gallina's lawyer, and vice versa. Both juries heard the testimony of both defendants who decided, after hearing the prosecution's case, that they would testify. Each defendant denied firing the fatal shot, and each indicated that his codefendant must have shot Charles Schramek. All the prosecution witnesses testified before both juries.

Despite its pretrial ruling, the court refused to dismiss either defendant's jury while his codefendant's lawyer cross-examined the prosecution's witnesses. The court refused to dismiss the Gallina jury when Rode's lawyer indicated that his cross-examination would elicit testimony that incriminated Gallina.[4]

At the close of the proofs, both defendants were convicted of second-degree murder and possession of a firearm during the commission of a felony.

---

[3] This request was made later in the trial, after the defendants both decided to testify.

[4] For a detailed discussion of the instances in which one defendant's cross-examination of the prosecution's witnesses unfairly implicated his codefendant, see part VI.

III

Appellate opinions concerning severance generally begin by stating that joint trials are favored because they are more efficient than separate trials, they enable a more accurate assessment of relative culpability, and they reduce the risk of inconsistent verdicts. Few appellate courts, however, have taken the time to determine whether the assumptions underlying these rationales are valid.

A close examination of the rationales favoring joint trials indicates that they are not as sound as they may initially appear. In his authoritative article on joint trials, *Joint trials of defendants in criminal cases: An analysis of efficiencies and prejudices,* 77 Mich L R 1379 (1979), Professor Robert O. Dawson demonstrates that joint trials are not as beneficial as is often assumed.

Professor Dawson suggests that joint trials do not save a significant amount of prosecutorial or police resources. A joint trial "does not affect the police investigation, which is usually completed before the prosecutor decides on charging and joinder."[5] Nor would a more liberal rule in favor of severance affect pretrial proceedings "which may be held jointly, even when the trials are separate."[6]

Severing the cases of two defendants often would "not even make a substantial difference in the time the prosecutor spends preparing for trial."[7] In separate trials, of course, the prosecutor would have to review the case file a second time, but, after learning the case for the first trial, he

[5] *Id.* at 1383.
[6] *Id.*
[7] *Id.*

"would surely not need as much time as he would to prepare a new case."[8]

It is far from clear that a strict rule against severance significantly conserves judicial resources more so than a rule favoring severance. Joint trials "are more complicated to conduct and take longer to complete than individual trials."[9] The trial judge in a joint trial must address complicated problems concerning jury selection, the order of the presentation of proofs, and the timing of arguments to the jury.[10] There will often be more objections in a joint trial because "as the number of defense attorneys increases, it is less likely that all will decide for tactical reasons not to object when an opportunity is presented."[11] Many of the objections may "require extensive arguments or lengthy testimony outside the presence of the jury."[12]

Nor are joint and dual-jury trials the only means of preventing duplicative testimony. Lawyers could stipulate much "necessary but undisputed noncritical testimony."[13] For instance, "the testimony of the owner of burglarized premises could be stipulated if there were no dispute that the burglary took place."[14] Professor Dawson suggests that "[u]nder appropriate circumstances, the trial court could even condition severance on stipulations of such testimony."[15] Stipulations of this sort would conserve both judicial resources and the

---

[8] *Id.* at 1384.
[9] *Id.* at 1386.
[10] *Id.*
[11] *Id.* at 1387.
[12] *Id.*
[13] *Id.* at 1385.
[14] *Id.*
[15] *Id.*

time of nonessential witnesses.[16] In sum, separate trials need not be more consuming of judicial resources as is commonly assumed.

The "consistency of verdict" rationale ignores that "our society has made it clear by adopting the jury system that it values other considerations more than mere consistency of result."[17] In Professor Dawson's words:

> One does not have to acknowledge jury nullification to accept that a jury introduces greater uncertainty into all trials: this uncertainty is tolerated for the sake of greater procedural values. In separate, sequential trials, skilled attorneys will select juries best suited to the individual clients. Perhaps a defendant's right through counsel to select a jury suited to try his particular case is an important trial right, one which a joint trial with its inevitable "compromise jury" should not be able to override in the name of "consistency."[18]

I do not mean to suggest that the judicial system derives absolutely no benefit from joint trials and dual-jury trials. In some instances, joint trials undoubtedly save courts and witnesses both time and annoyance. The point, however, is that the rationales in favor of joint and dual-jury trials are not without their weaknesses. When a court is faced with claimed prejudice from joint or dual-jury trials, it should keep in mind that the case in favor of joint and dual-jury trials—against which claims of prejudice are to some degree balanced—is not as strong as is commonly assumed. A court

---

[16] Witnesses could also be spared the trouble of giving duplicate testimony through the use of videotaped deposition testimony. Both the prosecutor and defense counsel could jointly take the deposition of certain noncritical witnesses, and then this testimony could be presented in front of the juries at separate trials.

[17] *Id.* at 1392.

[18] *Id.*

should also keep in mind that even if joint and
dual-jury trials are somewhat efficient, "[t]he first
order of business of the criminal courts . . . is
justice, not economy or convenience . . . ." *People
v Ricardo B,* 73 NY2d 228, 235; 535 NE2d 1336
(1989), in which the New York Court of Appeals,
its highest court, affirmed a conviction following a
dual-jury trial, but said that it shared "the reser-
vations other courts have expressed" concerning
the dual-jury procedure. *Id.* at 234.

IV

In these cases in which the defendants seek
severance because of antagonistic defenses, the
court rule and statute concerning severance, MCR
6.121 and MCL 768.5; MSA 28.1028, begin, but do
not end, the inquiry. MCR 6.121 provides:

(A) Permissive Joinder. An information or in-
dictment may charge two or more defendants with
the same offense. . . . Two or more informations
or indictments against different defendants may be
consolidated for a single trial whenever the defen-
dants could be charged in the same information or
indictment under this rule.

\* \* \*

(C) Right of Severance; Related Offenses. On a
defendant's motion, the court must sever the trial
of defendants on related offenses on a showing
that severance is necessary to avoid prejudice to
substantial rights of the defendant.

(D) Discretionary Severance. On the motion of
any party, the court may sever the trial of defen-
dants on the ground that severance is appropriate
to promote fairness to the parties and a fair deter-
mination of the guilt or innocence of one or more
of the defendants. Relevant factors include the
timeliness of the motion, the drain on the parties'
resources, the potential for confusion or prejudice

stemming from either the number of defendants or the complexity or nature of the evidence, the convenience of the witnesses, and the parties' readiness for trial.

While MCR 6.121(C) establishes the standard for determining when severance is required—when it is necessary to avoid prejudice to substantial rights of the defendant—it does not elaborate on what constitutes either prejudice or substantial rights.[19] It is thus our task to determine how the "substantial rights" of a defendant might be "prejudiced" in a joint trial in which he and his codefendant present antagonistic or mutually exclusive defenses.

The United States Court of Appeals for the Ninth Circuit has provided the clearest exposition of how the presentation of antagonistic defenses can prejudice codefendants. In *United States v Tootick*, 952 F2d 1078, 1082-1083 (CA 9, 1991),[20] the Ninth Circuit explained:

> The joinder of defendants advocating mutually exclusive defenses can have a prejudicial effect

[19] The staff comment to MCR 6.121 implicitly recognizes that the rule does not provide guidance concerning what constitutes "prejudice" or "substantial rights." The comment explains that, in a joint trial, a codefendant's testimony that squarely places the blame for the offense on the defendant is an example of prejudice to the defendant's substantial rights.

[20] *Tootick* is fully consistent with the United States Supreme Court's recent decision in *Zafiro v United States*, 506 US 534; 113 S Ct 933; 122 L Ed 2d 317 (1993). In *Zafiro*, the Court refused to adopt a rule that a joint trial is improper per se where two codefendants present mutually exclusive defenses. The Ninth Circuit did the same in *Tootick*. As *Zafiro* instructs, the court in *Tootick* required the defendant to demonstrate how he was prejudiced by the district court's refusal to sever his trial from that of his codefendant. 952 F2d 1083.

*Zafiro* requires defendants to show prejudice where the trial court denies a motion to sever in a case in which the defendants present mutually antagonistic defenses. *Tootick* enunciates specific examples of prejudice.

upon the jury, and hence the defendants, in a number of ways.

Defendants who accuse each other bring the effect of a second prosecutor into the case with respect to their codefendant. In order to zealously represent his client, each codefendant's counsel must do everything possible to convict the other defendant. The existence of this extra prosecutor is particularly troublesome because the defense counsel are not always held to the limitations and standards imposed on the government prosecutor. Opening statements, as in this case, can become a forum in which gruesome and outlandish tales are told about the exclusive guilt of the "other" defendant. In this case, these claims were not all substantiated by the evidence at trial. Counsel can make and oppose motions that are favorable to their defendant, without objection by the government.

Cross-examination of the government's witnesses becomes an opportunity to emphasize the exclusive guilt of the other defendant or to help rehabilitate a witness that has been impeached. Cross-examination of the defendant's witnesses provides further opportunities for impeachment and the ability to undermine the defendant's case. The presentation of the codefendant's case becomes a separate forum in which the defendant is accused and tried. Closing arguments allow a final opening for codefendant's counsel to portray the other defendant as the sole perpetrator of the crime.

Joinder can provide the individual defendants with perverse incentives. Defendants do not simply want to demonstrate their own innocence, they want to do everything possible to convict their codefendants. These incentives may influence the decision whether or not to take the stand, as well as the truth and content of the testimony.

The joint trial of defendants advocating mutually exclusive defenses produces fringe benefits for the prosecution. Joinder in these cases can make a complex case seem simple to the jury: convict them both.

The government's case becomes the only unified

and consistent presentation. It presents the jury with a way to resolve the logical contradiction inherent in the defendants' positions. While the defendants' claims contradict each other, each claim individually acts to reinforce the government's case. The government is further benefited by the additive and profound effects of repetition. Each important point the government makes about a given defendant is echoed and reinforced by the codefendant's counsel.

Joinder of defendants who assert mutually exclusive defenses has a final subtle effect. All evidence having the effect of exonerating one defendant implicitly indicts the other. The defendant must not only contend with the effects of the government's case against him, but he must also confront the negative effects of the codefendant's case.

Justice Stevens, concurring in *Zafiro v United States,* 506 US 534, —; 113 S Ct 933; 122 L Ed 2d 317, 328 (1993), also recognized the unfairness in forcing a defendant to face two prosecutors:

> The burden of overcoming any individual defendant's presumption of innocence, by proving guilt beyond a reasonable doubt, rests solely on the shoulders of the prosecutor. Joinder is problematic in cases involving mutually antagonistic defenses because it may operate to reduce the burden on the prosecutor, in two general ways. First, joinder may introduce what is in effect a second prosecutor into a case, by turning each codefendant into the other's most forceful adversary.

Mutually exclusive defenses in a joint trial may also prejudice a defendant's substantial rights when the acceptance of one defendant's defense would necessarily require the conviction of his codefendant. This dilemma arises when at least one of two defendants on trial must have committed the charged offense and the defendants each

deny culpability and blame the other.[21] A defendant is prejudiced by a joint trial in this situation because the prosecution may be relieved of proving its case against that particular defendant beyond a reasonable doubt. The prosecutor can simply rely on the process of elimination to secure at least one conviction. In Justice Stevens words:

> [J]oinder may invite a jury confronted with two defendants, at least one of whom is almost certainly guilty, to convict the defendant who appears the more guilty of the two regardless of whether the prosecutor has proven guilt beyond a reasonable doubt as to that particular defendant. [122 L Ed 2d 328.]

A number of federal and state courts have recognized the prejudice to defendants in a trial in which the jury "must" find at least one of the two defendants guilty. In *Tootick* two defendants were jointly tried and convicted of assault (a stabbing) resulting in serious bodily injury under 18 USC 113(f). There was no question that one of the two defendants had stabbed the victim because the stabbing occurred when the two defendants and the victim were alone in an isolated area. Each defendant claimed that the other had stabbed the victim and that he had nothing whatsoever to do with the crime.[22] Only one of the defendants testified, but each defense clearly implicated the other.

[21] In some instances, we can be certain that at least one of the defendants must have committed the charged offense. For example, if the two defendants on trial are the only two persons who have access to a certain restricted area or to certain classified information (i.e., a computer database), we can be sure that a crime occurring in the restricted area or involving the restricted information must have been committed by at least one of those with access (the defendants). Thus, the conclusion that one of the defendants is innocent in effect requires the conviction of the other defendant.

[22] One of the defendants claimed that he had passed out in an alcohol-induced stupor when the stabbing occurred, and the other claimed that the first defendant stabbed the victim as he (the second defendant) looked on in horror. 952 F2d 1081.

The Ninth Circuit held that the defendants had been prejudiced by the joint trial, in part, because "[e]ach defense theory contradicted the other in such a way that the acquittal of one necessitates the conviction of the other."[23] The contradictions in the defenses hindered the jury's ability "to assess the guilt or innocence of each defendant on an individual and independent basis." *Id.* at 1082.[24]

Similarly, in *United States v Rucker,* 915 F2d 1511 (CA 11, 1990), the Georgia Highway Patrol stopped the two defendants for speeding, and, after

[23] 952 F2d 1081.

[24] *Zafiro* does not diminish the persuasiveness of the Ninth Circuit's holding that a defendant is prejudiced when the jury's acceptance of a codefendant's story would necessitate his conviction. In *United States v Buena-Lopez,* 987 F2d 657 (CA 9, 1993), decided after *Zafiro,* the Ninth Circuit cited *Zafiro* and *Tootick.* The court held that *Tootick* did not control the instant case because the jury *could* have believed each defendant's story without necessarily convicting the other. 987 F2d 661. The court thus gave no indication that *Zafiro* undermined *Tootick.*

In an unpublished decision, *United States v Mason,* 26 F3d 134 (table), 1994 WESTLAW 266102 (CA 9, June 15, 1994), the Ninth Circuit said:

> To obtain severance on the ground of antagonistic and mutually exclusive defenses, the codefendants must show that the acceptance of one party's defense precludes acquittal of another defendant. *United States v Sherlock,* 865 F2d 1069, 1081 (CA 9, 1989). Antagonism between the defenses must rise to the level of being irreconcilable and mutually exclusive. *Id.* This typically occurs where each of two defendants claims innocence, while seeking to prove that the other committed the crime. *United States v Tootick,* 952 F2d 1081.

In a number of other post-*Zafiro* cases, United States Courts of Appeals have implied that a defendant is prejudiced when, as the result of conflicting defenses, the jury *must* convict him if it acquits his codefendant. See, e.g., *United States v Yefsky,* 994 F2d 885, 896-897 (CA 1, 1993) (noting that after *Zafiro* "mere antagonism of defenses does not require severance," and that "the tension between defenses must be so great that a jury would have to believe one defendant at the expense of the other"); *United States v Rivera,* 6 F3d 431, 438 (CA 7, 1993) (the court found no prejudice to a defendant in a joint trial and noted that the jury *could* have acquitted the defendant even if it acquitted the codefendant).

searching the vehicle, the officers found crack cocaine in the front passenger floorboard. Each of the defendants denied knowing that the cocaine was in the automobile, and each insisted that, because he did not know about the drugs, the cocaine must have belonged to the codefendant.

The United States Court of Appeals for the Eleventh Circuit reversed the district court's decision not to grant the defendants separate trials. The court said:

> We have two related codefendants, one of whom owns the vehicle, both asserting their ignorance of the contraband, even though it was quite literally right under foot. No reasonable juror could believe *both* of their stories, for to do so would mean that the contraband had been placed there by some unknown third party, and that neither defendant had thought to investigate this mysterious parcel. The unlikely juxtaposition of the co-defendants' protestations of innocence would make each defendant "the government's best witness against the other." [915 F2d 1513. Citations omitted; emphasis in original.]

The Eleventh Circuit thus shared the Ninth Circuit's view that a defendant is prejudiced if the jury must convict him if it believes his codefendant's story.

In *Commonwealth v Moran,* 387 Mass 644; 442 NE2d 399 (1982), the Supreme Judicial Court of Massachusetts held that the denial of a motion to sever was an abuse of discretion where the Commonwealth introduced evidence that "at least one defendant, but not necessarily both of them" had committed the crime and where "[t]he only realistic escape for either defendant was to blame the other."[25] The court said:

---

[25] *Id.* at 659.

Where there is convincing evidence that a crime has been committed by at least one of the defendants, a jury, disinclined for any reason to convict a particular defendant, may be inclined to find the other guilty. There is a danger that the jury will feel compelled to choose between defendants rather than to assess the proof against each defendant separately.[26] Finally, with one defendant pitted against the other, there is a danger that the jury will unjustifiably infer from the conflicting defenses alone that both defendants are guilty. [*Id.* at 659. Citations omitted.][27]

In sum, when confronted with defendants seeking severance on the ground of antagonistic defenses, our task (and that of trial courts considering motions for severance) is to determine whether the defendant will be prejudiced in any of the afore-

[26] The United States Supreme Court's decision in *Zafiro* has not weakened this aspect of the *Moran* decision. Indeed, even after *Zafiro*, *Moran* still seems to be "good law" in Massachusetts. See *Commonwealth v Clarke,* 418 Mass 207, 217; 635 NE2d 1197 (1994) (the court affirmed the decision not to sever in part because "[t]his is not a case, like *Commonwealth v Moran*, in which the defendants presented 'mutually antagonistic and irreconcilable' defenses"); *Commonwealth v Smith,* 418 Mass 120, 125-126; 634 NE2d 1380 (1994) (the court affirmed a decision to sever and noted that "[u]nlike many other cases in which severance is sought, this case does not involve mutually antagonistic defenses, where the acceptance of one party's defense necessarily precludes the acquittal of the other. See *Commonwealth v Moran*").

[27] See also *Hill v State,* 481 So 2d 419, 425 (Ala Crim App, 1985), in which the court said:

We agree that, "antagonistic defenses do not per se require severance, even if the defendants are hostile or attempt to cast the blame on each other." "Antagonism of defenses requires severance only where the defenses are so inconsistent that the jury would have to believe one defendant at the expense of the other; the conflict alone establishes the guilt of a defendant." "[S]everance is required because of 'mutually antagonistic defenses' only when the defenses are so antagonistic that 'the acceptance of one party's defense will preclude the acquittal of the other.'" [Citations omitted.]

mentioned ways. If a defendant demonstrates[28] that he will be so prejudiced by a joint trial, his trial should be severed from that of a codefendant.

I note that even when a defendant is unable to meet the requirement for severance under MCR 6.121(C), a trial court has the discretion to order severance if it "is appropriate to promote fairness to the parties and a fair determination of the guilt or innocence of one or more of the defendants." MCR 6.121(D).

v

The trial judge erred in refusing to sever Durid Hana's trial from that of his brother, Kafan Hana. Kafan's lawyer correctly observed that the brothers' defenses could not have been any more antagonistic.

The police found three kilograms of cocaine in a safe in Durid Hana's house. The evidence showed that both Durid and Kafan Hana had access to the safe, and there was *no* evidence indicating that anyone other than the two brothers had access to the safe. It was thus evident before the trial that

---

[28] While a defendant's conclusory claim that he will suffer prejudice in a joint trial because he and a codefendant have antagonistic defenses is clearly not sufficient to prevail on a motion for severance, a defendant should not be required to present too detailed a showing of prejudice in a pretrial motion for severance. As Professor Dawson explained, "predicting trial prejudice [in the joint trial context] before the trial begins is guessing at best." Dawson, *supra,* p 1410. "Most often, the defense attorney may suspect prejudice from joinder, but be unable to foresee the exact events that will harm his client." *Id.,* p 1411.

Thus, while a court may properly demand from a defendant seeking severance more than mere conclusory statements concerning the conflicting defenses, a court should not require a detailed description of exactly how the conflict will play out at trial. An affidavit explaining the nature of the conflict (i.e., the defense that each defendant will offer, the witnesses that each will call, etc.) and demonstrating in a general manner how the conflict will cause prejudice, see text above, should suffice.

the jury would surely conclude that at least one of the brothers placed the cocaine in the safe.

During the trial, the prosecutor invited the jury to make just such a deduction. In her closing statement, she said:

> The position that Durid Hana and Kevin [sic] Hana had taken in this trial is saying that the drugs did not belong to them, but they were in their bedroom and they were in a safe that they both had access to, and *if you believe both Durid Hana and Kevin Hana, the good fairy must have delivered those drugs and locked them in the safe.* [Emphasis added.]

This statement indicates the prejudice of a joint trial—it made clear to the jury that it had to convict at least one of the defendants.

The prosecutor's comment invited the jury to find the defendant guilty on the basis of the discrepancies between their stories. The clear implication of the prosecutor's comment was that neither of the defendants was presenting a truthful defense, and, on the basis of the conflicting defenses, the jury should infer that both defendants were guilty. By inviting the jury to draw the inference of guilt from the conflicting defenses, the prosecutor relieved herself of the burden of proving the defendants' individual guilt beyond a reasonable doubt.[29] See *Tootick, supra; Zafiro, supra* (Stevens, J., concurring).

Each defendant was further prejudiced by the actions of his codefendant's lawyer. In his opening statement, Kafan Hana's attorney lamented that

---

[29] This case is different from *Zafiro* because there is no indication that the prosecutor in *Zafiro* explicitly focused on the conflicting defenses. While conflicting defenses may not be prejudicial per se, the danger of prejudice from such defenses is much greater when the prosecutor highlights the conflict between the defenses as she did in the instant case.

the trial had "brother pitted against brother." His words proved to be prophetic.

When Kafan Hana's lawyer cross-examined the police officer who took Durid Hana's statement, the answers elicited by his testimony emphasized that Durid Hana "owned the safe and it was his [Durid's] safe." Kafan's lawyer twice induced the witness to state that Durid owned and used the safe. Then, in his closing argument, Kafan Hana's lawyer argued that because Kafan did not own the safe, he did not have the right to control the drugs found by the police in the safe. Considered in light of the earlier questions that emphasized that Durid owned the safe, the implication is clear: Durid, the owner of the safe, controlled the drugs.

The counterattack of Durid Hana's lawyer was just as strong, if not stronger. In his opening statement, Durid Hana's lawyer said that "there will be no testimony, that will indicate that Durid Hana had directly any contact, that he knew of or had any contact with the three kilos of cocaine." He then observed that "[t]here certainly will be testimony that will indicate that Kafan Hana had access to the safe where the cocaine was found." Then, in his cross-examination of the officer who took the statement of Mr. Alsarih,[30] Durid Hana's lawyer emphasized that Mr. Alsarih mentioned only Kafan, and not Durid, as his cocaine connection.

In his closing statement, Durid Hana's lawyer fully assumed the role of prosecutor vis-à-vis Kafan Hana.[31] The following are excerpts from the closing statement:

> You heard testimony from both Officer Putnam

---

[30] Mr. Alsarih was involved in the transaction. He agreed to testify for the prosecution.

[31] The attorneys at various times referred to Kafan as "Kevin" and to Durid as "Derek."

and Mr. Alsarih that they went to the house looking for *Kevin* and *he* wasn't there. They came back looking for *Kevin,* and *he* wasn't there. They came back a third time looking for *Kevin,* and while they were there, *Kevin* arrived.

\* \* \*

I would ask you to think back on the testimony as you heard it. There was a contact midday with *Kevin,* 12 ounces of coke, no problem. There was a contact attempted with *Kevin.*

\* \* \*

*Kevin* arrives home. They come inside, flip on the light. *Kevin* comes up with three and a half ounces of cocaine out of the bag in his pocket. *He* goes right into the closet, comes out with the bag of cocaine. A total of 12 ounces, mixes them together. . . . Now, at the time that *he* [Kevin] gives Mr. Alsarih this 12 ounces, *he's* delivered the 12, it's over and done, the delivery is made. . . .

[Then,] *Kevin* said, "This is on the house," and threw that in on the deal.

\* \* \*

This deal was set up between two people [Kevin and Alsarih].

\* \* \*

[Mr. Alsarih] testified he set out to and put the deal together with *Kevin* Hana.

\* \* \*

The testimony is the safe was in a closet. The testimony is that when *Kevin* and Alsarih came in, *Kevin* went into the closet. Alsarih testified Derek was asleep in bed, but *Kevin* went into the closet. *Kevin,* apparently, had a hard time opening the safe, but he opened it with no assistance, no comments from Derek . . . . *Kevin* opened the safe. *Kevin* took out some drugs, apparently.

You're being asked to make leaps of faith that because one brother was in that safe and presumably would know what was in it when he opened the door and took out the cocaine, that the other

brother must know what's in the safe. [Emphasis added.]

As these excerpts demonstrate, the defendants each suffered prejudice when his lawyer took on the role of the prosecuting attorney.[32] Each defendant had to defend against the prosecutor *and* the other's lawyer, and, in many instances, the defense lawyers seem to have done a more effective job than the prosecution of demonstrating each defendant's guilt.

For the foregoing reasons, I would reverse the Court of Appeals decision affirming the trial court's denial of the severance motion, and grant a new trial.

VI

Before addressing the merits of the Gallina and Rode appeals, it is important to clarify the question presented. The question presented is *not* whether these defendants should have had completely separate trials. The prosecutor waived that argument when he did not object to the defendants' motions for severance and when, in the Court of Appeals, he did not argue that severance was not required.[33] The *only* question presented is,

[32] See *Tootick, supra* at 1084 (the defendant suffered prejudice where the opening statement by the codefendant's attorney placed blame on the defendant and mentioned him "twenty-five times by name, and seventy-two times by the use of personal pronouns").

[33] Cf. *People v Hoffman,* 205 Mich App 1, 19; 518 NW2d 817 (1994). The Court in *Hoffman* said:

> We reject defendant's contention that being tried jointly with his codefendant denied him a fair trial. This issue was not preserved for appellate review. Defendant neither sought a separate trial nor objected to a joint trial. Failure to move for a separate trial precludes appellate review.

In the instant case, the prosecutor did not object to the defendants'

assuming that the defendants were entitled to *at least* partial severance through the use of dual juries,[34] whether that solution provided the defendants "*the same protections as* [*they*] *would have enjoyed through . . . separate trial* [*s*]." *People v Brooks,* 92 Mich App 393, 395; 285 NW2d 307 (1979) (emphasis added). This inquiry should be made with great care because the use of multiple juries "can involve substantial risks of prejudice to a defendant's right to a fair trial." *State v Corsi,* 86 NJ 172, 178; 430 A2d 210 (1981).[35]

The manner in which the trial court administered the dual-jury procedure in this case did not afford the defendants the same protection that they would have enjoyed through separate trials.

The trial court failed to excuse Gallina's jury when Rode's counsel impeached a key prosecution witness with his prior statement that implicated Gallina. The prosecution called Edward Schramek, the driver of the car in which the victim was riding, as a witness in its case in chief. On direct examination, Schramek testified that he did not know which of the passengers in the Camaro had fired the shot that killed the victim, and the

---

motions for severance, did not object to the defendants' request that the jury be chosen out of separate venires, and did not object to either lawyer's request that his client's jury be removed from the courtroom when the other defense lawyer was cross-examining certain witnesses.

[34] These defendants clearly were entitled to at least partial severance through the use of dual juries. One and only one of them could have fired the fatal shot. They each accused the other of firing that shot. Thus, if the jury accepted one of the defendants' stories, it might have been obliged to convict the other. See discussion of *Commonwealth v Moran, supra.*

[35] Other appellate courts have also recognized the risk of prejudice to a defendant's right to a fair trial in a dual-jury trial. See, e.g., *People v Ricardo B,* 130 AD2d 213, 218-219; 518 NYS2d 843 (1987); *State v Hernandez,* 163 NJ Super 283, 287; 394 A2d 883 (1978) (in a dual-jury trial, "[t]here are too many opportunities for error to take place which would end in a reversal if a conviction occurs, resulting in needless expense and a waste of judicial resources and counsels' precious time").

prosecutor did not press Schramek on this point. Rode's attorney then began to cross-examine Schramek. After asking Schramek a few questions, Rode's attorney informed the court that he was going to impeach Schramek with Schramek's earlier statement that implicated Gallina, and he asked the court to excuse the Gallina jury. The court refused.

Rode's attorney then asked Schramek the following question:

> Now did you not indicate to Officer Brennan, a Police Officer Brennan at the police station shortly after you arrived, that the person who shot your brother was the front passenger of the red vehicle [i.e., Gallina]?

Shortly thereafter, Gallina's attorney objected that this line of questioning "is being presented in front of my jury." The court ruled that Gallina's lawyer had no standing to object.[36]

On recross-examination, Rode's lawyer again impeached Schramek with his earlier statement that implicated Gallina. Counsel showed Schramek a copy of the police report that contained the statement in question and asked Schramek:

> Does that refresh your recollection as to whether or not you told Officer Brennan that the front passenger in the red vehicle [i.e., Gallina] shot your brother Charles?

---

[36] The trial court's refusal to remove the Gallina jury after being informed by Rode's counsel that he [counsel] was about to impeach Schramek with a prior statement that incriminated Gallina, and after the appropriate objection by Gallina's counsel is especially troubling in light of the court's earlier promise that, as long as it was given notice by the lawyers, it would remove each jury in order to prevent this very type of harm.

The judge had earlier indicated to the lawyers that "I have no problem with excusing the other lawyer's jury if it's necessary, but I sure am going to have to rely on you two to give me a hint . . . I'll only be ruling on it when you give me it."

Had Gallina been tried separately, his jury would not have learned of Schramek's prior statement that implicated Gallina. The prosecutor did not question Schramek concerning his earlier statement and presumably would not have done so in a separate trial because the inconsistency between Schramek's earlier statement and his testimony undermined his credibility. Gallina's lawyer, moreover, would never have questioned Schramek concerning his earlier statement because to do so would have undermined his own client's position. Thus, because Gallina's jury learned of certain evidence that it would not have learned in a completely separate trial, the dual-jury procedure in the instant case did not provide Gallina "the same protection he would have had in a separate trial."

Rode was similarly denied the protection he would have enjoyed had he been tried in an entirely separate trial when Gallina's lawyer cross-examined Brad Andrews, one of the back-seat passengers, concerning his ability to see the shooting. On direct examination, Andrews testified that he could not see whether Eric Rode leaned out the automobile window and fired the gun because his view was blocked by Jimmy Kelly, the middle passenger in the back seat.

On cross-examination, Gallina's lawyer twice suggested that Kelly was blocking Andrews' view because he was leaning over to hold Eric Rode's legs so that Rode would not fall out of the car as he shot at the Schramek vehicle. Andrews did not deny that Kelly was holding Rode's legs. Andrews and Gallina's lawyer had the following exchange:

*Q.* He was blocking your view because he was doing something with his hands back there, wasn't he, when he had his back turned to you?

*A.* I'm not sure.

*Q.* In fact, he was holding the legs of Eric Rode so he wouldn't fall out the window, wasn't he?

*A.* I don't know. I'm not sure.

*Q.* Jim Kelly was the closest one to Eric Rode, wasn't he, Mr. Andrews?

*A.* Yes.

*Q.* And somebody had to hold him so he wouldn't fall out the window; is that correct?

Had Rode been tried separately, his jury would not have heard this damaging questioning. The prosecutor did not pursue this line of questioning at trial, and presumably would not have done so at an entirely separate trial, because the prosecutor used Andrews' statement to police that he, Andrews, saw Rode lean out the window and fire at the other automobile. It would not have been in the prosecutor's interest to establish that Andrews did not have a clear view of Rode. And Rode's lawyer surely would not have asked questions that implied that his client leaned out the window and fired shots at the other automobile. Thus, the dual jury procedure did not provide Rode with the same protection that he would have enjoyed in an entirely separate trial.

In affirming convictions returned following a dual-jury trial, a number of courts have noted that neither defendant's jury observed cross-examination by the other defendant's lawyer.[37]

---

[37] See, e.g., *Smith v DeRobertis,* 758 F2d 1151, 1151 (CA 7, 1985) ("Both juries were present for the opening statements and for the state's direct examination of the prosecution witnesses, but Smith's jury was excused for Bell's cross-examination of those witnesses and for Bell's defense case [Bell testified], while Bell's jury was excused for the corresponding portion of Smith's trial"); *People v Brooks, supra* at 394 ("a procedure was arrived at in which both juries would be present for the prosecutor's opening statement and the prosecutor's direct examination of witnesses. At all other times only one jury would be present, each hearing the matters relevant to its own case"); *State v Hernandez,* n 35 *supra* at 286 ("Full direct and cross-examina-

The effect that the exchanges between Rode's lawyer and Schramek, and between Gallina's lawyer and Andrews, may have had on the respective juries should not be underestimated. By the time these cases were submitted to the juries, the dominant issue had become essentially the credibility contest between Gallina and Rode. Two of the other passengers in the vehicle had testified for the prosecution and one other passenger for Rode, but none clearly identified either of the defendants as the shooter of the fatal shot.[38] Each defendant provided the strongest evidence that the other had fired the fatal shot,[39] but inconsistencies in the testimony of both defendants were brought out on cross-examination.[40] In short, the evidence did not

tions were had of all witnesses, either before all three juries or an individual jury, as the circumstance required").

[38] Jonathan Warmack, the driver of the automobile in which Gallina and Rode were riding, could not identify who fired the fatal shots, but he was certain that Gallina did not. On direct examination, he testified that Rode said, "I know I hit him," after he fired the gun, but on cross-examination, Warmack conceded that Rode may have said, "I know I hit . . . 'em," referring to the automobile in a more general sense rather than to one of the occupants of the automobile.

Brad Andrews, one of the back-seat passengers, testified that he did not see who was shooting the gun over the roof of the automobile, but that he did see Eric Rode inside the automobile at the time those shots were fired. The prosecutor impeached Andrews with his statement to the police that Eric Rode leaned out the window and fired the shots over the roof. Andrews also testified that he was extremely intoxicated on the night of the shooting.

James Kelly testified before the Rode jury alone that he did not know who fired the fatal shots.

[39] Rode testified that he fired at the tires of the other automobile and that he never fired at the body of the vehicle or at the occupants of the vehicle. He then testified that Gallina shot the gun at the other automobile as it drew alongside. Gallina testified that he shot the gun only in the air and that Rode took the gun from him because he, Rode, was frustrated that Gallina would not shoot directly at the other automobile. According to Gallina, after Rode took the gun, Rode fired shots directly at the other automobile and then said, "I know I got them, I know I got them."

[40] On cross-examination, Eric Rode first testified that he did not see Aldo Gallina aim the gun or fire the first shot toward the other automobile, but, after the prosecutor showed Rode a copy of his

clearly indicate who fired the fatal shot. In light of
the lack of convincing evidence concerning which
of the defendants fired the fatal shot, the ex-
changes adverted to above were prejudicial be-
cause they may well have influenced each jury to
find that the defendant in whose case it was
sitting in judgment had fired the fatal shot.[41]

### VII

Gallina and Rode also argue that they were
prejudiced by the trial court's refusal to pick the
juries from separate venires. While the defendants
correctly note that a trial court should pick the
juries from separate venires in a dual-jury trial, I
do not believe that the defendants suffered preju-
dice as a result of the trial court's failure to do so
in the instant case.

The juries in a dual-jury trial should be chosen
from separate venires to prevent one form of
prejudice that the dual-jury procedure is meant to
avoid: the exposure of one defendant's jury to the
antagonistic defense of his codefendant. If a jury

statement to the police, Rode changed his story and testified that he
saw Gallina aim the gun and fire the first shot at the other automo-
bile. Also on cross-examination, Rode initially claimed that he could
not remember whether Jimmy Kelly helped him reload the gun, but
after seeing a copy of his statement he quickly recalled that Kelly
had helped him reload. Finally, Rode testified that, although he was
right-handed and had no experience with firearms, he tried to shoot
out the tires of the other automobile with the gun in his left hand. He
could not explain why he held the gun in his left hand.

On cross-examination, Gallina's veracity was called into question
when the prosecutor confronted Gallina with his statement to the
police. Although Gallina had signed the statement and initialed *every*
page of the statement to confirm its accuracy, he claimed that the
statement did not accurately reflect what he told the police.

[41] While it is true that the prosecutor charged Aldo Gallina solely
as an aider and abettor and did not argue that Aldo Gallina fired the
fatal shot, Eric Rode testified that Gallina fired the fatal shot. Galli-
na's jury might well have believed Rode and, in effect, found Gallina
guilty as the principal even though he was charged as an aider and
abettor.

learns of a codefendant's antagonistic defense, there is a danger that the jury will conclude that each defendant is lying and convict on the basis of the conflicting defenses alone. See *Tootick, supra.*

When separate juries in a dual-jury trial are chosen from a single venire, there is a substantial risk that the voir dire questions from defense lawyers and the court will apprise all the jurors of the conflicting defenses. For this reason, the juries in a joint trial should be chosen from separate venires.[42]

In the instant case, however, the voir dire procedure did not substantially inform the prospective jurors of the defendants' mutually antagonistic defenses. Both lawyers' questions focused primarily on the potential jurors' views of youthful offenders and on their ability to focus on the intent element of the charge. Neither lawyer mentioned the conflicting defenses. Thus, in this case, the defendants did not suffer prejudice as a result of the trial court's failure to pick the juries from separate venires.[43]

I would reverse and remand for separate new trials.

CAVANAGH, C.J., concurred with LEVIN, J.

[42] A number of appellate courts that have affirmed convictions in dual-jury trial have noted that the juries were chosen from *separate* venires. See, e.g., *State v Hernandez,* n 35 *supra* at 286 ("Three juries of 14 were picked from separate panels and instructed not to discuss the cases with each other"); *People v Wardlow,* 118 Cal App 3d 375, 384; 173 Cal Rptr 500 (1981) ("The two juries were chosen from venires that were mutually exclusive"); *State v Lambright,* 138 Ariz 63, 68; 673 P2d 1 (1983) ("Under this 'dual jury' procedure, two juries were chosen from separate venires . . ."); *People v Harris,* 41 Cal 3d 1047, 1066; 255 Cal Rptr 352; 767 P2d 619 (1989) ("The two juries were separately selected").

[43] The trial court refused the lawyer's specific request to pick the juries from separate venires because "I don't do it that way, counsel." This is clearly an unacceptable reason for refusing to pick the juries from separate venires.