# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

KEJUAN MARCELL DOUGLAS,

       Defendant-Appellant.

UNPUBLISHED
November 1, 2016

No. 326666
Wayne Circuit Court
LC No. 14-007399-FC

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

CHARLES ANTHONY DOUGLAS,

       Defendant-Appellant.

No. 327354
Wayne Circuit Court
LC No. 14-005015-FC

Before: GADOLA, P.J., and WILDER and METER, JJ.

PER CURIAM.

Defendants Kejuan Douglas and Charles Douglas were tried jointly, before a single jury. The jury convicted Kejuan of two counts of first-degree criminal sexual conduct (CSC), MCL 750.520b(1)(d)(*ii*), for which the trial court sentenced him to prison terms of 20 to 60 years for each conviction, to be served consecutively. The jury convicted Charles of third-degree CSC, MCL 750.520d(1)(b); assault and battery, MCL 750.81; first-degree CSC, MCL 750.520b(1)(d)(*ii*); and unarmed robbery, MCL 750.530. The trial court sentenced Charles to concurrent prison terms of 10 to 15 years each for the third-degree CSC and unarmed robbery convictions, to be served consecutively to a prison term of 40 to 90 years for the first-degree CSC conviction, and to time served (93 days) for the assault conviction. Both defendants appeal as of right. We affirm each defendant's convictions, but remand for further inquiry of Charles's sentences consistent with *People v Lockridge*, 498 Mich 358, 392; 870 NW2d 502 (2015), and *People v Steanhouse*, 313 Mich App 1; 880 NW2d 297 (2015), lv gtd 499 Mich 934 (2016).

-1-

A jury convicted defendants, who are brothers, of sexually assaulting a 16-year-old female victim inside a van in an isolated Detroit neighborhood on August 16, 2013. Approximately one month before the assault, the victim met Charles on Tagged.com, a free online social website, and on the day in question she decided to ask him for a ride to her Inkster home. The prosecution presented evidence that after Charles picked up the victim in a van, he then picked up Kejuan and another, unidentified man. Charles made several stops, including at a motel, where the victim informed him that she wanted to go home. Charles did not take her home, but instead parked on a dark street. Kejuan pulled the victim into the back of the van, and she was forced to perform fellatio on Kejuan while Charles simultaneously sexually assaulted her from behind. After this, Kejuan forced penile-vaginal sex upon her. When Kejuan finished, the unidentified man sexually assaulted the victim with defendants' encouragement. The victim was ultimately left on the street, but managed to take Charles's phone. As the victim was on the phone with 911, the van returned and Charles chased her to the porch of a house, attempting to retrieve his phone. Charles fled and the homeowner opened the door. DNA recovered from abrasions on the victim and a towel that Charles had used and left at the scene matched Charles's DNA profile. The prosecution also presented evidence that Charles's DNA was matched to DNA obtained in another sexual assault case in 2013, in which that victim, who identified Charles, similarly testified that she met Charles on Tagged.com, that he picked her up, and that he drove her to a house where she was sexually assaulted by him and several other men. Kejuan's defense theory at trial was that he was misidentified as an assailant. Charles, who testified on his own behalf, denied any wrongdoing, and claimed that he engaged in consensual sexual activity with the victim.

## I. DOCKET NO. 326666 (DEFENDANT KEJUAN DOUGLAS)

In his only issue on appeal, defendant Kejuan Douglas argues that the trial court abused its discretion by denying his motion for a mistrial after the court admitted newly discovered other-acts evidence against Charles. We review a trial court's ruling on a motion for a mistrial for an abuse of discretion. *People v Schaw*, 288 Mich App 231, 236; 791 NW2d 743 (2010). An abuse of discretion occurs when a trial court chooses an outcome that is outside the range of principled outcomes. *Id.*

Before trial, defendant Kejuan had no objection to a joint trial. After trial started, the prosecution received information that codefendant Charles's DNA had been matched to a similar sexual assault case. Ultimately, the trial court agreed to admit the newly discovered other-acts evidence against codefendant Charles only. In turn, Kejuan moved for a mistrial, arguing that in light of this newly discovered evidence against his codefendant, he was entitled to a separate trial. The trial court denied his motion.

A mistrial should be granted "only for an irregularity that is prejudicial to the rights of the defendant and impairs his ability to get a fair trial." *Id.* (citations and quotation marks omitted). In general, a defendant does not have a right to a separate trial. *People v Hurst*, 396 Mich 1, 6; 238 NW2d 6 (1976). Indeed, a strong policy favors joint trials in the interest of justice, judicial economy, and administration. *People v Etheridge*, 196 Mich App 43, 52; 492 NW2d 490 (1992). Severance is mandated under MCR 6.121(C) only when a defendant demonstrates that his substantial rights will be prejudiced and that severance is the necessary means of rectifying the potential prejudice. *People v Hana*, 447 Mich 325, 345; 524 NW2d 682 (1994), amended 447

Mich 1203 (1994). For severance to be warranted, a defendant must submit an affidavit or make an offer of proof that "clearly, affirmatively, and fully demonstrates that his substantial rights will be prejudiced and that severance is the necessary means of rectifying the potential prejudice." *Id.* at 346. "The failure to make this showing in the trial court, absent any significant indication on appeal that the requisite prejudice in fact occurred at trial, will preclude reversal of a joinder decision." *Id.* at 346-347. Mere inconsistency of defenses is not enough to require severance; the defenses must be mutually exclusive or irreconcilable. *Id.* at 349. "[I]ncidental spillover prejudice, which is almost inevitable in a multi-defendant trial, does not suffice. The tension between defenses must be so great that a jury would have to believe one defendant at the expense of the other." *Id.* (citations and quotation marks omitted). Severance should be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at 359-360 (citations and quotation marks omitted).

To hold separate trials in these substantially identical cases would have been unnecessarily duplicative and excessive. The interests of justice, judicial economy, and orderly administration clearly favored a joint trial. Kejuan has not provided any concrete facts or reasons to justify separate trials and has not persuasively demonstrated that his substantial rights were prejudiced by a joint trial. The record does not show a "significant indication" that the requisite prejudice in fact occurred at trial. *Id.* at 346-347. Kejuan's mere speculation about the possibility of antagonistic defenses is insufficient to require a separate trial; he made no offer of proof demonstrating a defense that would have required the jury to believe one defendant at the expense of the other. On appeal, he adds the argument that had he known that other-acts evidence would be presented against Charles, "there was the possibility he could have presented a defense claiming that it was Charles and not him who committed the offenses, that [the victim] was mistaken in her identification, [and] that his brother, Charles, had brought him into the picture in order to minimize his own involvement [in] the offenses." Kejuan's defense theory, however, was already that he was misidentified, i.e., that he was not there, and that the victim was not credible. Further, "finger pointing" is not a sufficient reason to grant separate trials. See *id.* at 360-361. Finally, the risk of prejudice from the joint trial was allayed by a proper cautionary instruction. *Id.* at 351, 356. The trial court instructed the jury that each case was to be decided separately and, regarding the other-acts testimony against codefendant Charles, specifically instructed:

> [T]his evidence that you are about to hear applies *only to the defendant, Charles Douglas*.
>
> It is not evidence of any kind, and *you can not [sic] consider it in any way as it applies to the other defendant, Mr. Kejuan Douglas*.
>
> Okay. So it's being introduced for a limited purpose and *only as it applies to the defendant, Charles Douglas*. [Emphasis added.]

Kejuan acknowledges the trial court's instruction, but asks this Court to presume that the jury ignored the instruction and used the other-acts evidence to his detriment. It is well established, however, that jurors are presumed to have followed their instructions. *People v Breidenbach*, 489 Mich 1, 13; 798 NW2d 738 (2011). Kejuan has not identified any record

support, and we have found none, for his suggestion that the jury disregarded the trial court's instruction. Because Kejuan has failed to show that he was entitled to severance, the trial court's denial of his motion for a mistrial on that basis was not an abuse of discretion.[1]

## II. DOCKET NO. 327354 (DEFENDANT CHARLES DOUGLAS)

### A. ADMISSION OF OTHER-ACTS EVIDENCE

Defendant Charles Douglas argues that his defense was unfairly prejudiced by the admission of the other-acts evidence, which was not discovered until after trial had already started, and accordingly, the trial court abused its discretion in admitting this evidence.[2] We review the trial court's decision to admit the evidence for an abuse of discretion. *People v Burns*, 494 Mich 104, 110; 832 NW2d 738 (2013). As Charles observes, he must show that he was unfairly prejudiced by the evidence to be entitled to relief. *People v Callon*, 256 Mich App 312, 328; 662 NW2d 501 (2003).

Charles asserts that he was unfairly prejudiced for three distinct reasons. First, Charles argues that unfair prejudice resulted because defense counsel did not have the opportunity to ask questions during jury voir dire "to ensure that jurors hearing [the other-acts] evidence could keep an open mind and not immediately conclude that [Charles] was guilty . . . ." Charles does not indicate what additional questions counsel would have needed to ask to protect his right to a fair trial. The record discloses that the trial court and the attorneys adequately questioned the jury venire, and the trial court sufficiently instructed the potential jurors to ensure that they remained open-minded and understood the presumption of innocence. Moreover, before the jury heard the other-acts evidence, the trial court gave a cautionary instruction explaining the limited purpose of the evidence, which limited the potential for any prejudice. The trial court's instruction included the directive that the jury "must not convict the defendant here because you think he's guilty of other bad conduct," which directly addressed Charles's concern that the jury would assume that he was guilty because of the other act. Again, juries are presumed to have followed their instructions, *Breidenbach*, 489 Mich at 13, and there is no indication that the trial court's

---

[1] Without proper analysis, Kejuan also argues that the late introduction of the other-acts evidence prejudiced "possible plea negotiations." After the prosecution moved to admit the other-acts evidence, the trial court delayed ruling on the admissibility of the evidence against Kejuan until a live lineup was conducted with the victim in the other case. After the trial court's ruling, defense counsel stated that if Kejuan was identified, he would request a plea offer, but "[i]f he's not, my client is not interested." The prosecutor responded that if Kejuan was identified, there would be no offer. The witness did not identify Kejuan and, according to defense counsel, there was no interest in seeking a plea. Therefore, this argument is without merit.

[2] Charles does not argue that the other-acts evidence was not substantively admissible under MRE 404(b)(1). He also does not challenge the trial court's implicit finding that, given the late discovery of the evidence, the prosecution was justified in failing to provide the required pretrial notice under MRE 404(b)(2).

cautionary instruction was not effective in this case. Charles simply has not demonstrated that he was prejudiced as a result of the allegedly inadequate voir dire questioning.

Second, Charles argues that he was unfairly prejudiced because defense counsel "had no opportunity to make an effective choice of trial strategy . . . ." Defendant did not move for a continuance as a result of the newly discovered evidence, and we can discern no unfair prejudice from its admission. We agree that the other-acts evidence was impactful. However, for relief to be warranted here, defendant must have suffered unfair prejudice caused by the delay itself, not merely because of the impact of the evidence. Charles offers no argument for how his trial strategy would have differed had he known about the other-acts evidence before trial. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority." *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998).

Lastly, in an additional cursory complaint, Charles claims that defense counsel's inability to address the other-acts evidence in his opening statement "likely created the impression that [he] had no answer to such evidence and embarrassed the defense no matter what argument defense trial counsel subsequently made." It is difficult to conclude, however, that this situation created significant prejudice, given that the prosecutor was also unable to address this evidence in his opening statement. In addition, Charles's defense theory was consent. The new evidence did not negate that defense. Thus, Charles has not explained how he was unfairly prejudiced. Because the record does not establish any unfair prejudice to the defense, the trial court did not abuse its discretion in admitting the newly discovered other-acts evidence.

## B. UPWARD DEPARTURE SENTENCE

In his last issue, Charles argues that the trial court erred by departing from the sentencing guidelines range and imposing an unreasonable sentence. The trial court scored the guidelines for Charles's conviction of first-degree CSC, which is a class A offense. MCL 777.16y. Charles received a total offense variable (OV) score of 120 points, which, combined with his 45 prior record variable points, placed him in the D-IV cell of the applicable sentencing grid, for which the minimum sentence range is 171 to 285 months. MCL 777.62. The trial court departed from that range and sentenced him to 40 to 90 years' imprisonment. "A sentence that departs from the applicable guidelines range will be reviewed by an appellate court for reasonableness." *Lockridge*, 498 Mich 392.

At the time Charles was sentenced, MCL 769.34(3) required a sentencing court to state substantial and compelling reasons for imposing a sentence that departs from the sentencing guidelines range. As the parties recognize, after Charles was sentenced, significant changes to Michigan's sentencing scheme were effectuated by the Michigan Supreme Court's decision in *Lockridge*, 498 Mich 358. The Court held that Michigan's sentencing guidelines are "constitutionally deficient" to the extent that judicial fact-finding could be used to increase the guidelines minimum sentence range. *Id.* at 364. The Court "sever[ed] MCL 769.34(2) to the extent that it is mandatory and [struck] down the requirement of a 'substantial and compelling reason' to depart from the guidelines range in MCL 769.34(3)." *Id.* at 391. The Court held that "[a] sentence that departs from the applicable guidelines range will be reviewed by an appellate

-5-

court for reasonableness." *Id*. at 392. However, the *Lockridge* Court did not set forth a standard for reviewing a sentence for reasonableness. Accordingly, in *Steanhouse*, 313 Mich App at 47-48, this Court adopted the "principle of proportionality" previously established in *People v Milbourn*, 435 Mich 630; 461 NW2d 1 (1990), as the standard for reviewing a sentence for reasonableness, "hold[ing] that a sentence that fulfills the principle of proportionality under *Milbourn*, and its progeny, constitutes a reasonable sentence under *Lockridge*." This Court further held that in cases where the defendant was sentenced before *Lockridge* was decided, implementation of the reasonableness standard requires remand for consideration of the sentence's proportionality, following the remand procedure adopted in *United States v Crosby*, 397 F3d 103 (CA 2, 2005); specifically, this Court stated:

> Given our conclusion that the principle of proportionality established under *Milbourn*, and its progeny, is now the appropriate standard by which a defendant's sentence should be reviewed, we find that the procedure articulated in *Lockridge*, which is modeled on the procedure adopted in *United States v Crosby* . . . , should apply here. As recently stated by this Court in *People v Stokes*, 312 Mich App 181, 200-201, 877 NW2d 752 (2015), [appeal held in abeyance ___ Mich ___; 878 NW2d 886 (2016),] "the purpose of a *Crosby* remand is to determine what effect *Lockridge* would have on the defendant's sentence so that it may be determined whether any prejudice resulted from the error." While the *Lockridge* Court did not explicitly hold that the *Crosby* procedure applies under the circumstances of this case, we conclude that this is the proper remedy when, as in this case, the trial court was unaware of, and not expressly bound by, a reasonableness standard rooted in the *Milbourn* principle of proportionality at the time of sentencing. [*Steanhouse*, 313 Mich App at 48 (citation omitted).]

As in *Steanhouse* and, more recently, *People v Heller*, ___ Mich App___; ___ NW2d ___ (2016) (Docket No. 326821); slip op at 2, the trial court imposed a departure sentence without having an opportunity to adhere to the standard of reasonableness rooted in the *Milbourn* principle of proportionality. As this Court observed in *Heller*, "[g]iven *Steanhouse*'s directive, the trial court must be permitted to reconsider defendant's sentence in the light of *Milbourn*." *Heller*, ___ Mich App at ___; slip op at 2. Therefore, remand is necessary so that the trial court may implement the *Crosby* remand procedure as articulated in *Lockridge*.[3] The prosecutor concurs with this remedy.

---

[3] Within this issue, Charles also requests that we remand the matter to a different judge. We reject this request. Initially, we note that Charles fails to properly brief the merits of this request. *Kelly*, 231 Mich App at 640-641. He merely states that it "appears that the Judge's outrage at Mr. Douglas's allocution prompted the harsh sentence." We have reviewed the trial court's statements at sentencing and they give no cause for concern that its sentencing decision was based on inappropriate considerations. Further, remand is required in this case because of the post-sentencing decisions in *Lockridge* and *Steanhouse*, not because the trial court's sentence was patently erroneous.

We affirm Kejuan Douglas's convictions in Docket No. 326666. We affirm Charles Douglas's convictions in Docket No. 327354, but remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Michael F. Gadola
/s/ Kurtis T. Wilder
/s/ Patrick M. Meter